[No. D035274. Fourth Dist., Div. One. Feb. 8, 2002.]

LAURA AKERS, Plaintiff and Appellant, v.
COUNTY OF SAN DIEGO, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III. of the section entitled "County's Appeal" and all of the section entitled "Akers's Appeal."

1444

**COUNSEL**

Law Offices of Robert Vaage and Robert F. Vaage; McKenna & Cuneo and Michael H. Fish for Plaintiff and Appellant.

John J. Sansone, County Counsel, Diane Bardsley, Assistant County Counsel, William A. Johnson, Jr., and William Songer, Deputy County Counsel, for Defendant and Appellant.

## OPINION

**HALLER, Acting P. J.**—Laura Akers, a former deputy district attorney, sued the County of San Diego (County), claiming gender/pregnancy discrimination, violation of family leave act statutes, wrongful termination in violation of public policy, and unlawful retaliation. The jury found in Akers's favor on her retaliation claim, but found Akers did not prove her other causes of action. The jury initially awarded Akers $250,000, but the court reduced this amount to $150,000 after conditionally granting a new trial because of jury misconduct. The court entered judgment of $150,000 plus $249,345 in attorney fees.

On appeal, County contends insufficient evidence supported the jury's finding that Akers suffered an adverse employment action, and the court prejudicially erred in instructing on this element. County also challenges the sufficiency of the evidence to support the jury's finding that its actions were pretextual, and contends the trial court erred in admitting certain evidence on this issue. In her cross-appeal, Akers contends the court erred in granting a new trial on the basis of jury misconduct.

In the published portion of this decision, we conclude: (1) an adverse employment action within the meaning of a Fair Employment and Housing Act retaliation claim requires proof that the employer substantially and materially adversely affected the terms and conditions of the plaintiff's employment; and (2) the plaintiff satisfied this test by showing the retaliation eliminated or reduced her promotional opportunities within the district attorney's office. In the unpublished portion of the decision, we reject the parties' additional contentions. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

Akers began working as a San Diego County deputy district attorney in 1985. In 1993, Akers was assigned to the district attorney's family protection division where she prosecuted domestic violence cases. Akers enjoyed working with domestic violence victims, and developed an excellent reputation in this area.

In January 1995, Paul J. Pfingst became San Diego's elected district attorney. Two months later, Pfingst appointed Luis Aragon as the family protection division chief, and Aragon became Akers's supervisor. Aragon did not have daily contact with Akers because he worked in the downtown San Diego headquarters, whereas Akers worked in the El Cajon branch.

In December 1995, Akers's husband, Stephen Anear, who was also a San Diego County deputy district attorney, notified Aragon that Akers was

pregnant and the baby was due in approximately May 1996. Shortly there-after, Akers told Aragon that she had heard rumors she was going to be transferred out of the division and she wanted Aragon to assure her she could stay in El Cajon because she needed to be close to her baby. Aragon responded that this would not be a problem.

Two months later, in February 1996, Aragon told Akers he was concerned with the morale in the El Cajon family protection division, and believed Akers was not doing her fair share of the unit's misdemeanor work. He said he wanted to transfer her to the downtown office to satisfy Akers's desire to work on felony and high-profile cases, and to permit him to more closely supervise Akers. Akers responded by repeating her desire to stay in the El Cajon office to be close to her Lakeside home after her baby was born.

Shortly thereafter, Akers contacted Gregory Thompson, the second in command of the district attorney's office, who reported directly to Pfingst. Akers told Thompson that Aragon's criticisms of her were not justified, and she wanted assurance that she would stay working in the El Cajon office when she returned from maternity leave. Akers also told Thompson she did not want to continue working under Aragon.

After considering the matter, Thompson decided Akers's concerns would best be addressed by transferring her from the family protection assignment to a branch assignment in El Cajon. In the branch assignment, Akers would continue working in the El Cajon office, but she would not work on domestic violence cases and would have a different chain of command. Akers received written confirmation of this transfer on April 1, 1996. Consistent with established policy, the El Cajon branch chief, Michael Carleton, notified Akers that she would be given a misdemeanor rotation for one year.[2] But Akers was permitted to delay this assignment to complete the two family protection division homicide cases she had previously been assigned. Akers successfully prosecuted the two homicide cases in March and April 1996.

Akers delivered her baby on May 2, 1996, and was on maternity leave for the next three months. She returned to the El Cajon branch office on July 24, 1996, and, consistent with Carleton's previous written memorandum, Carleton assigned Akers to the misdemeanor unit under the supervision of Paul Johnsen, with whom Akers previously had personality conflicts. In August 1996, Akers asked for a transfer to the downtown office. She was not given

---

[2] At trial, Akers asserted that Thomson had promised she would work only on felonies in the new assignment. Thompson denied giving Akers any such assurances. The jury's findings on the special verdict form show the jury rejected Akers's testimony on this issue.

the transfer, but two months later Carleton moved Akers to another unit within the El Cajon misdemeanor trial team, where she would no longer be supervised by Johnsen.

In October 1996, Akers's attorney wrote a letter to District Attorney Pfingst, claiming Akers had been "forced out of the El Cajon domestic violence unit because she was pregnant, because she is a woman regardless of her pregnancy, and because she did not ascribe to the political views of certain managers at the District Attorney's office regarding who should be the district attorney." The letter stated that "an internal investigation by your office will confirm that Ms. Akers enjoyed and deserved an excellent reputation from her service in the domestic violence unit and that she was transferred out of that unit for improper reasons. Ms. Akers' career is important to her and these problems must be resolved in a fair manner. . . . [T]he proper handling of this matter will also enhance your credibility with the many community groups that view the prosecution of domestic violence as a priority. A number of these groups cannot understand the priorities that led to a woman of Ms. Akers' experience and commitment being assigned to misdemeanors and being replaced by much less experienced attorneys."

Within several days, Pfingst appointed his chief deputy, Keith Burt, and the chief of the South Bay branch, Joan Stein, to investigate Akers's discrimination allegations. Pfingst selected Burt to lead the investigation despite Pfingst's knowledge that Akers's husband, Stephen Anear, was in the process of investigating allegations of serious misconduct in the district attorney's gang unit while Burt supervised the unit. Burt was aware of Anear's investigation and, according to Anear, displayed substantial animosity towards him.

Several days after they were appointed to investigate Akers's allegations, Burt and Stein met with Akers to permit Akers to explain and support her discrimination claim. Akers urged Burt and Stein to talk with judges, detectives, and community organizations to show Aragon's criticisms of her were not valid and she had an excellent reputation in the domestic violence arena. Burt and Stein thereafter interviewed 12 of Akers's colleagues and supervisors, but did not interview judges or victim advocates as Akers had suggested. Burt prepared a witness statement after each interview, and then gave each witness the opportunity to make handwritten corrections to the statement. After making any necessary corrections, each witness signed the statement reflecting his or her interview and affirmed the statement was "true and accurate."

The essence of the witness statements was that Akers was an excellent domestic violence prosecutor, but she did not enjoy and did not follow

through with the more mundane tasks expected of prosecutors in this division, and she did not always get along with several of her fellow employees or strictly adhere to proper district attorney office hours. At trial, Akers presented evidence that although the witnesses had affirmed the truth of the statements, Burt had omitted information in some of the statements that was favorable to her, and that he exaggerated and overly emphasized the negative comments from her fellow district attorney employees. Akers also presented evidence that some of the witness statements concerned events that had occurred several years before the interview, and that several law clerks and investigators who were not interviewed believed Akers was an excellent prosecutor and worked equally hard on both felony and misdemeanor cases.

On January 21, 1997, Burt and Stein submitted a report to Pfingst regarding Akers's discrimination complaint. The report stated that Akers provided no factual support for her claim that she was forced out of the domestic violence unit because of her gender, pregnancy, or political views. The report further stated the "interviews support Mr. Aragon's evaluation" that Akers had "adversely affected morale in the El Cajon domestic violence unit," and that "Akers did not do a fair share of work, spent time reading the newspaper, talking on the telephone about personal matters and did non-job-related things while work piled up that ultimately had to be completed by others. . . ." The report said that Akers's coworkers and supervisors unanimously confirmed that "Akers is talented and demonstrates the ability to do exceptional case work on those matters that interest her[,]" but that the employees were equally uniform in their opinions that Akers's interest in work-related matters was limited to "big time cases and she actively avoids, even shirks responsibility for the more mundane matters that other deputy district attorneys do on a regular basis." Although Stein also signed the document, Burt was the primary author of the report.

Two days later, Burt told Akers to report to his office to discuss the results of his investigation. When Akers arrived for the meeting, she was taken to Pfingst's office. At the outset of the meeting, Pfingst gave her the witness statements and report, and told her to review the statements in a private office for as long as she wanted. After approximately 10 minutes, Akers came out of the office and said she did not agree with the opinions expressed in the witness statements. According to Akers, Pfingst responded in a "confrontational" manner, accused Akers of being "delusional," and said "You will not be going back to domestic violence cases ever." Pfingst denied making these statements.

After Akers left the meeting, Pfingst ordered an "improvement needed" performance evaluation to be prepared for Akers. A district attorney performance evaluation contains an overall performance grade and grades for 22

different categories. The possible grades are: "outstanding," "above standard," "standard," "improvement needed," and "unsatisfactory."

Consistent with Pfingst's instructions, Carleton (Akers's supervisor) prepared a performance review for Akers covering June 1996 through January 1997 with an overall "improvement needed" grade. The performance review also contained five "improvement needed" grades on (1) "punctuality"; (2) "application of effort"; (3) "performance with minimum supervision"; (4) "promptness in completing work"; and (5) "volume of work produced." On the remaining 15 applicable categories, Carleton gave Akers a "standard" rating. In the comments section, Carleton repeated the concerns about Akers's failure to devote energy to smaller cases and to maintain proper office hours, and emphasized that Akers's inappropriate work habits continued in her El Cajon branch misdemeanor assignment. But Carleton noted that "[i]n contrast to her demonstrated work habits, Ms. Akers is intelligent, articulate and very capable when she wants to be and she should be able to raise her evaluation if she exerts herself." Akers's internal appeal of the performance evaluation was largely unsuccessful.

In addition to ordering the performance evaluation, Pfingst directed Burt to prepare a written counseling memorandum to notify Akers of her job deficiencies. Under County's policy and procedures manual, the district attorney is required to follow a progressive approach to employee discipline, and the first "preliminary" step of a disciplinary action is to provide counseling, an oral warning, or a written warning. A counseling memorandum is not maintained in the employee's personnel file or in any other permanent record.

Because the counseling memorandum prepared by Burt was one of the primary retaliation actions relied upon by Akers to show an adverse employment action, we set forth its contents in some detail. The counseling memorandum first stated that by Akers is "responsible for improving the following aspects of [her] work:"

"1. Inefficiency—While working at a location distant from your immediate supervisor, on various occasions you have either refused or neglected to respond to calendar deputies who requested your appearance in court. You have ignored cases you were responsible for, that were of little interest to you, while focusing your time and energy on relatively few cases (usually felonies) that were interesting to you.

"2. Incompetence—Cases submitted by police agencies for issuance regularly remained under your dominion and control, unattended for an

unacceptable amount of time (approximately two to three months); in one instance the statute of limitations expired. In several instances you failed to complete Complaint Request Evaluations on your rejected cases. You have failed to communicate with a significant percentage of victims and witnesses in your cases.

"3. Dishonesty—On numerous occasions your punctuality at work has been poor. You either arrived late, left early or were unavailable during normal work hours. In addition, you were often observed during normal work hours reading newspapers or talking on the telephone about non-job-related matters.

"4. Productivity—Your work performance and productivity, in comparison with that of other deputies in your position, is insufficient."

The counseling memorandum then listed eight standards with which Akers must comply: (1) appearing in court when requested to do so by calendar deputy district attorneys; (2) managing time proportionately with case work so that all cases receive adequate attention; (3) completing a review of cases assigned for issuance within no more than 30 days; (4) providing an explanation to a supervisor for failing to return telephone calls, including from victims and witnesses; (5) immediately informing a supervisor if Akers experienced difficulty in managing the work; (6) working "8:00 a.m. to 5:00 p.m., . . . and tak[ing] a lunch break only from noon to 1:00 p.m.," absent a supervisor's prior approval; (7) "perform[ing] . . . work such that [Akers's] productivity is generally equivalent to other deputy district attorneys performing comparable job functions"; and (8) "treat[ing] other office employees and members of the public with respect and courteousness at all times."

The counseling memorandum concluded by emphasizing that continued inappropriate job-related behavior or failure to comply with the specified corrective actions "may result in disciplinary actions" and that the memorandum is confidential and should not be discussed with anyone except for her attorney, district attorney management, or her direct supervisor.

In February 1997, Akers was given copies of the performance evaluation and counseling memorandum, and was assigned to remain on the El Cajon misdemeanor team under the supervision of Deputy District Attorney Ronald Mendes. Carleton told Mendes to provide monthly reports of Akers's work and to closely monitor her "comings and goings," although the evidence showed that other employees were not monitored and did not strictly adhere to office hours. Mendes's subsequent monthly reports were positive and full

of praise for Akers's work habits and substantive work. Mendes did not in fact strictly monitor Akers's hours.

During the next several months, Akers complied with each of the counseling memorandum standards, and performed her job in an outstanding manner. In July 1997, the district attorney planned an office-wide rotation, during which various deputies would be rotated to new assignments. As preparation for this process, Carleton informed Akers that an "elder abuse position is apparently open," and suggested that Akers speak with Paul Greenwood who worked in that unit. Akers contacted Greenwood and expressed interest in the position, but was never transferred to that unit.

Akers instead remained in the El Cajon branch, and, consistent with established branch policies, Akers rotated to the felony trial team. Shortly thereafter, Akers received a new performance evaluation covering the prior six-month period. The evaluation contained an overall "standard" rating, and showed Akers had made outstanding progress and was performing "above standard" in three categories. Burt signed the evaluation.

Three months later, Akers sent Pfingst a letter requesting a voluntary one-year leave of absence, stating "the principal reason for the leave request is my desire to spend more time with my 17-month old daughter. Secondary reasons include attending to details related to our home remodeling project and anticipated relocation of our residence." Pfingst approved the request. At trial, Akers additionally stated the reason for the leave of absence was that "I could see that I had made repeated attempts to go back to doing family protection work both in domestic violence and elder abuse, and that I was, that wasn't going to happen . . . . [¶] . . . the primary thing was I kind of wanted to get out of the atmosphere I was in and step back from it. And decide what I was going to do."

At the end of her scheduled one-year leave of absence, Akers opted not to return to work. At trial she explained that "the people who had made these decisions about my career, Mr. Pfingst and Thompson and Burt, were still in charge of the administration. I didn't feel that I was given any opportunity to address the allegations that had been made in the counseling memo. I felt that that was a black mark on my career. That would remain there. I had repeatedly, from the beginning of this, requested to try to resolve the situation so I could continue to do work in an area that I cared about and I had expertise in, and that clearly wasn't going to happen. [¶] If I returned . . . . I'd be getting a paycheck basically. . . . I know what the label of being a problem in the D.A.'s office would be. And I didn't want to return." In February 1999, Akers submitted her formal letter of resignation and then filed her lawsuit against County.

At trial, Akers asserted four causes of action: (1) discrimination on the basis of gender/pregnancy in violation of the Fair Employment and Housing Act (FEHA); (2) pregnancy discrimination in violation of the California Family Rights Act and the federal Family and Medical Leave Act; (3) wrongful termination in violation of public policy; and (4) retaliation in violation of the FEHA and Labor Code section 1102.5.

The first three causes of action were based primarily on Akers's contention that her transfer from the domestic violence unit into a misdemeanor position constituted unlawful gender/pregnancy discrimination and violated the family leave act statutes. The final (retaliation) cause of action was based on Akers's contention that the district attorney retaliated against her after her attorney complained about gender/pregnancy discrimination in his October 1996 letter. County defended by presenting evidence and arguing that Akers's transfers were legitimate management decisions that had nothing to do with Akers's pregnancy/gender, and that the actions taken against her after the October 1996 letter were not motivated by improper reasons and did not show Akers suffered an adverse employment action.

The jury found in County's favor on the first three causes of action, but found Akers proved her retaliation claim. On Akers's retaliation claim, the jury found Akers proved (1) she "engage[d] in a legally protected activity"; (2) County "subject[ed] [Akers] to an adverse employment action"; (3) Akers's "legally protected activity [was] more likely than not a motivating factor in [County's] adverse employment action"; (4) County would not have taken "the same adverse actions in the absence of the unlawful motive"; and (5) County's actions caused damage to Akers. The jury found Akers did not prove any economic damages, but awarded her $250,000 in noneconomic damages.

County then moved for a new trial based on jury misconduct, supported by juror declarations showing the jurors had included attorney fees in their damages calculation. Akers opposed the motion, arguing the declarations were inadmissible and the evidence did not show an improper juror agreement. After considering the declarations, the court found the jury had entered into an express agreement to include $100,000 for attorney fees in its award, and this agreement was admissible evidence of jury misconduct supporting a new trial. The court, however, denied the new trial motion on condition that Akers file a notice of consent to a reduction of the verdict to $150,000. Akers thereafter filed a notice of consent to accept the reduction.

The court entered judgment in the amount of $150,000 plus $249,345 in attorney fees.[3]

## COUNTY'S APPEAL

### I. *Introduction*

Under the FEHA, it is unlawful "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint . . . under this [Act]." (Gov. Code, § 12940, subd. (h).) Similarly, under Labor Code section 1102.5, subdivision (b), an employer may not "retaliate against an employee for disclosing information to a government . . . agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute . . . ."

■ To establish a prima facie case of retaliation, the plaintiff must show (1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) a causal link between the protected activity and the employer's action. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 814-815 [89 Cal.Rptr.2d 505]; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522].) Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68 [105 Cal.Rptr.2d 652].) If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation "drops out of the picture," and the burden shifts back to the employee to prove intentional retaliation. (*Ibid.*)

At trial, Akers relied exclusively on her attorney's October 1996 letter complaining of pregnancy/gender discrimination to show she engaged in protected activity. County does not challenge that the letter satisfied this element. County instead contends there was insufficient evidence to prove the "adverse employment action" prong, and argues the court prejudicially erred in instructing on this element. We shall address these arguments in part II of this section. In an unpublished portion of this opinion, we consider County's challenge to the sufficiency of evidence supporting the jury's

---

[3]It appears the attorney fees were awarded based on Government Code section 12965, subdivision (b), which provides a court discretion to award attorney fees to prevailing parties in an FEHA action. (See *Linsley v. Twentieth Century Fox Film Corp.* (1999) 75 Cal.App.4th 762, 765 [89 Cal.Rptr.2d 429].)

finding that its explanation for the challenged actions was pretextual, and the related asserted evidentiary error.

## II. *Adverse Employment Action*

### A. *Governing Law*

To prove her retaliation claims, Akers was required to show County subjected her to an "adverse employment action." (*Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 510-511 [91 Cal.Rptr.2d 770]; *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 476.) Although there is scant authority in California defining the meaning of an adverse employment action under the FEHA, a plethora of federal courts have considered the issue in construing the analogous federal antidiscrimination statute, and have reached differing conclusions. (See generally *Ray v. Henderson* (9th Cir. 2000) 217 F.3d 1234, 1240-1243; Fitzpatrick, *The Developing Doctrine of Materially Adverse Employment Action* (ALI-ABA Cont. Legal Ed. July 17, 1997) Current Developments in Employment Law, 627.) Some courts have held that an adverse employment action is limited to an ultimate employment decision (hiring, firing, failure to promote, demotion) (see *Mattern v. Eastman Kodak Co.* (5th Cir. 1997) 104 F.3d 702, 707-708), whereas other courts have more broadly defined the element to include intermediate decisions made in the employment context. (*Von Gunten v. Maryland* (4th Cir. 2001) 243 F.3d 858, 866, fn. 4; *Kim v. Nash Finch Co.* (8th Cir. 1997) 123 F.3d 1046; *Smart v. Ball State University* (7th Cir. 1996) 89 F.3d 437, 441.) Courts in the latter category have additionally reached contrary conclusions in determining which forms of intermediate employment decisions are actionable. (Compare *Spears v. Mo. Dept. of Corr. & Human Resources* (8th Cir. 2000) 210 F.3d 850, 854 with *Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 929.)

One California Court of Appeal recently surveyed this federal authority and concluded that even if it were to broadly interpret the adverse employment action element under the FEHA, an employer should not be held liable unless the plaintiff shows the employer's retaliatory actions had "a detrimental and substantial effect" on the plaintiff's employment. (*Thomas v. Department of Corrections, supra,* 77 Cal.App.4th at p. 512.) The *Thomas* court noted that "most circuits require that the action 'be more disruptive than a mere inconvenience or an alteration of job responsibilities,' " and echoed the First Circuit Court of Appeals's observation that " '[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.' " (*Id.* at p. 511, quoting *Blackie v. State of Me.* (1st Cir. 1995) 75 F.3d 716, 725.)

We agree with those federal courts that have held an adverse employment action is not limited to "ultimate" employment acts, such as a specific hiring, firing, demotion, or failure to promote decision. The legislative purpose underlying FEHA's prohibition against retaliation is to prevent employers from deterring employees from asserting good faith discrimination complaints, and the use of intermediate retaliatory actions may certainly have this effect. But we also agree with the *Thomas* court's observation that to be actionable, the retaliation must result in a substantial adverse change in the terms and conditions of the plaintiff's employment. A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient. Requiring an employee to prove a substantial adverse job effect "guards against both 'judicial micromanagement of business practices,' [citation] and frivolous suits over insignificant slights." (*Russell v. Principi* (D.C. Cir. 2001) 257 F.3d 815, 818.) Absent this threshold showing, courts will be thrust into the role of personnel officers, becoming entangled in every conceivable form of employee job dissatisfaction. While the Legislature was understandably concerned with the chilling effect of employer retaliatory actions and mandated that FEHA provisions be interpreted broadly to prevent unlawful discrimination, it could not have intended to provide employees a remedy for any possible slight resulting from the filing of a discrimination complaint.

One federal court recently identified the "countervailing concerns" in defining an adverse employment action: "On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a [discrimination] complaint . . . , making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions." (*Brooks v. City of San Mateo, supra,* 229 F.3d at p. 928.)

In balancing these policies and implementing FEHA's statutory objectives, we conclude an action constitutes actionable retaliation only if it had a substantial and material adverse effect on the terms and conditions of the plaintiff's employment. Although an employer's "intermediate" action may be retaliatory, it does not form the basis of an FEHA retaliation claim unless it satisfies this test. Applying this test, we consider County's argument that insufficient evidence supported the jury's finding that Akers suffered an adverse employment action. We then determine whether the trial court's refusal to properly instruct on the meaning of an adverse employment action was prejudicial.

### B. Sufficiency of the Evidence

 At trial, it was undisputed that four months after Akers complained, the County issued a negative performance review and counseling memorandum—accusing her of "incompetence," "dishonesty" and "insubordination." It was also undisputed that "an accusation of dishonesty" against a prosecutor "can be a career ender" and that a deputy district attorney's reputation for honesty is an essential quality of a successful prosecutor. All agreed Akers was a fine trial attorney capable of handling difficult and sensitive cases. The evidence further showed Akers was in a deputy district attorney III position, and that the next level of promotion, deputy district attorney IV, was highly competitive and largely controlled by the "subjective evaluations" of superiors. Although Akers did not prove a denial of a specific promotional opportunity, there was evidence showing Akers left the district attorney's office because of the adverse actions taken against her and the severe damage to her reputation within the office. This was coupled with evidence that Pfingst told Akers she would never again work in the domestic violence arena—an area in which she excelled—and top management refused to transfer her to the elder abuse unit.

Taking into account all of this evidence, a jury could reasonably conclude the negative evaluation and counseling memorandum were undeserved and retaliatory; key decision makers of the district attorney's office intended to substantially and materially obstruct Akers's prosecutorial career; and had Akers remained in the office these actions would have taken effect. Based on this, the jury could reasonably infer Akers would not be promoted as long as the current leadership was in office, and that had she not asserted a discrimination complaint, her chances for advancement were excellent. In short, the jury could conclude Akers was no longer "promotable" because she complained. Where an employer reacts to a discrimination complaint by eliminating a reasonable potential for promotion or materially delaying the promotion, there is a legally tenable basis for a jury to find the employer substantially and materially adversely affected the terms and conditions of the plaintiff's employment. (See *Boone v. Goldin* (4th Cir. 1999) 178 F.3d 253, 255, 256-257 [recognizing that "reduced opportunities for promotion" may constitute an adverse employment action supporting a title VII claim].)

County does not challenge the conclusion that reduced promotional opportunities may constitute an adverse employment action under the FEHA. Instead, it argues the "dishonesty" and "incompetence" labels contained in the counseling memorandum could not have had an adverse effect on Akers's job because the memorandum is a "confidential" document under County policies and was never placed in Akers's personnel file. However,

the critical point is that the decision makers in the district attorney's office were aware of the serious accusations contained in the reports, and the jury could reasonably infer they would base future employment decisions on those accusations. Moreover, the evidence showed these reports were in fact "subject[s] of conversation" among the deputy district attorneys in the office, and the specific monitoring aspects of the counseling memorandum were disclosed to at least one lower level supervisor. Further, Pfingst acknowledged at trial that Burt had the full authority to share the results of the investigation with others in the district attorney's office.

County additionally argues that negative performance reviews or counseling memoranda are generally insufficient to show an adverse employment action under analogous title VII law. ■ We agree that a mere oral or written criticism of an employee or a transfer into a comparable position does not meet the definition of an adverse employment action under FEHA. (See *Grube v. Lau Industries, Inc.* (7th Cir. 2001) 257 F.3d 723, 729-730; *Phillips v. Collings* (8th Cir. 2001) 256 F.3d 843, 848; *Spears v. Mo. Dept. of Corr. & Human Resources, supra,* 210 F.3d 850; *Smart v. Ball University, supra,* 89 F.3d at p. 442.)[4] But, as County recognizes, the issue requires a factual inquiry and depends on the employer's other actions. An unfavorable employee evaluation may be actionable where the employee proves the "employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (*Spears v. Mo. Dept. of Corr. & Human Resources, supra,* 210 F.3d at p. 854; accord, *Lucas v. W.W. Grainger, Inc.* (11th Cir. 2001) 257 F.3d 1249, 1261; *Merriweather v. Alabama Dept. of Public Safety* (M.D.Ala. 1998) 17 F.Supp.2d 1260, 1275.) Thus, although written criticisms alone are inadequate to support a retaliation claim, where the employer wrongfully uses the negative evaluation to substantially and materially change the terms and conditions of employment, this conduct is actionable.

■ Here, taking into account the totality of the circumstances, including the language used in the performance evaluation and counseling memorandum which labeled Akers as dishonest, incompetent and insubordinate, and the evidence that the top management demonstrated its willingness to use this information against Akers in significant employment decisions, there was sufficient evidence for the jury to find County's retaliatory actions would preclude reasonable promotional opportunities and therefore constituted adverse employment actions under FEHA.

### C. *Instructional Error*

■ County next contends the court erred in rejecting its proposed instruction on the meaning of an adverse employment action. The proposed

---

[4]To the extent the Ninth Circuit Court of Appeals has reached an opposite conclusion under title VII (*Brooks v. City of San Mateo, supra,* 229 F.3d at p. 928), we find this view unpersuasive.

instruction read: "To constitute an adverse job action, the action must have a materially adverse change on the terms or conditions of the plaintiff's employment. What is materially adverse is determined from the perspective of an objectively reasonable employee. A materially adverse change requires something more disruptive than a mere inconvenience or a change in job responsibilities."

Akers does not dispute that County's proposed instruction reflects a correct statement of the law. Indeed, in her trial court briefs, Akers conceded that "[t]he 'adverse employment decision' element of a claim under FEHA . . . must involve some 'materially adverse change in the terms or conditions' of the Plaintiff's employment." Akers instead contends the court did not err in rejecting this instruction because another one of the court's retaliation instructions adequately covered the subject matter and adequately conveyed to the jury that Akers was required to prove the retaliation had a material effect on the terms and conditions of her employment.

The instruction was as follows: "*It is unlawful for an employer to* demote, suspend, reduce, fail to hire, or consider for hire, fail to give equal consideration in making employment decisions, fail to treat impartially in the context of any recommendations for subsequent employment which the employer may make, adversely affect working conditions or otherwise deny any employment benefit to an individual because that individual has opposed practices prohibited by the FEHA or has filed a complaint, testified, assisted, or participated in any manner an investigation, proceeding, or hearing conducted by the commission or department or their staffs." (Italics added.)

This instruction mirrors the second paragraph of BAJI No. 12.10, except that this paragraph of BAJI No. 12.10 does not begin with the words "It is unlawful for an employer to" and instead begins "Acts of retaliation include . . . ."

BAJI No. 12.10's second paragraph, as modified by the trial court, did not adequately inform the jury of the meaning of an adverse employment action. First, this paragraph listed examples of unlawful conduct but did not connect these examples to the adverse employment action element of a retaliation cause of action. Without this nexus, the jury was not provided adequate guidance that the "unlawful" conduct discussed in the second paragraph defines the meaning of an adverse employment action. Although the court's instruction quoted from the applicable administrative regulation defining retaliatory conduct (Cal. Code Regs., tit. 2, § 7287.8), verbatim quotations should not be used to instruct a jury if the wording, as applied, is confusing or seemingly inapplicable.　　" 'Instructions in the language of a statute [or regulation] should only be given " 'if the jury would have no

difficulty in understanding the statute [and how it should be applied] without guidance from the court.' " [Citations.]' [Citation.]" (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 784 [64 Cal.Rptr.2d 301].)[5]

 More important, the instruction given by the court did not properly define an adverse employment action because it did not tell the jury that to be actionable the employer's retaliatory conduct must have had a *substantial and material* adverse effect on the terms and conditions of Akers's employment. While many of the examples of retaliation in the given instruction are certainly substantial and adverse, the instruction did not limit the definition to these examples and left room for the jury to conclude that a mere change in the conditions of employment (i.e., the denial of a transfer with the same pay and benefits, or the annoyance and embarrassment inherent in a negative performance review) was enough to constitute an adverse employment action.

 A court should define the meaning of an element of a cause of action if the legal definition is different from the commonly understood meaning. (See *People v. Estrada* (1995) 11 Cal.4th 568, 574-575 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) As reflected in the dictionary definition, the term "adverse" can mean anything that is "[c]ontrary to one's interests or welfare, unfavorable; unpropitious . . . ." (American Heritage Dict. (New college ed. 1981) p. 19.) Thus, to a layperson, the phrase "adverse employment action" could reasonably include anything that happens to an employee that is not in his or her favor. This definition is inconsistent with the legal meaning, which more narrowly includes only adverse actions that substantially and materially affect the terms and conditions of an employee's job.

We thus conclude the trial court erred in failing to give an instruction defining an adverse employment action to mean only those actions that substantially and materially adversely affect the terms and conditions of the plaintiff's employment. But a court's failure to properly instruct is reversible only if the appellant shows it is reasonably probable it would have obtained a more favorable result if there had been the proper instruction. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

During closing argument, Akers's counsel specifically told the jury it must find that County "materially adversely chang[ed] the terms or conditions of

---

[5]Akers's reliance on *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138 [65 Cal.Rptr.2d 112] is misplaced because the court did not state or suggest that an instruction in the regulatory language would be proper. Instead, the court merely held that the employer's terminating the plaintiff as a temporary nurse and denying her compensation constituted a retaliatory action as defined in the administrative code section. (See Cal. Code Regs., tit. 2, §§ 7287.8, subd. (a), 7286.5, subd. (f).)

the employment." Counsel made this statement when discussing the particular elements of Akers's retaliation claim and expressly referred to the BAJI No. 12.10 instruction. Immediately after telling the jury of this materiality requirement, counsel discussed the particular evidence upon which Akers was relying to show such a material change in the terms and conditions of her employment.

Although a counsel's closing statements do not replace the need for the court to properly instruct the jury, Akers's counsel's clear and straightforward discussion in his closing argument made the jury aware that to be actionable an adverse employment action must have a material effect on the terms and conditions of Akers's employment. In contrast to these remarks informing the jury of the proper standard, there was no indication from the other instructions, jury arguments, or evidence that the jury would have been misled to believe that it could find an adverse employment action based on evidence less than a substantial and material adverse change in Akers's terms and conditions of employment.

On this record, County failed to meet its burden to show prejudicial error. It is not reasonably probable the jury would have reached a different verdict on the retaliation claim if it had been properly instructed.

### III. *Pretext Finding**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### AKERS'S APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment affirmed. Akers to recover costs on appeal.

McDonald, J., and McIntyre, J., concurred.

---

*See footnote 1, *ante,* page 1441.