Filed 11/4/13  Redeker v. Collateral Specialists CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JAMES A. REDEKER,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>COLLATERAL SPECIALISTS INC.,<br><br>        Defendant and Respondent. | A136291<br><br>(Marin County<br>Super. Ct. No. CIV1100779) |

Plaintiff James A. Redeker brought this case against his former employer, Collateral Specialists Inc. (CSI), for wrongful termination in violation of public policy and Labor Code section 1102.5, unfair business practices, and invasion of privacy.  In this appeal, he challenges the trial court's order granting CSI summary judgment.  We affirm summary adjudication of Redeker's claim for invasion of privacy, but we reverse summary adjudication of his other three claims.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

CSI provides services to banks and other lenders by inspecting collateral used to secure loans.  The inspections are performed by field representatives, whom CSI classifies as independent contractors.  Beginning in December 2007, CSI employed Redeker as Operations Manager, and his duties included assigning work to field representatives.  Redeker reported to Kevin Power, CSI's Vice President of Operations.

1

James Jennings (J. Jennings) was President of CSI and co-owned the company with Brian Jennings (B. Jennings), the Executive Vice President.

Redeker came to believe that CSI's classification of the field representatives as independent contractors, rather than employees, might be wrong. In November 2009, he met with Power and J. Jennings to discuss his concern. The meeting's participants recall the event differently. J. Jennings testified that he told Redeker CSI was aware of various state laws governing employee classification, that CSI made every effort to comply with those laws, and that an IRS audit had confirmed CSI was properly classifying the field representatives. J. Jennings and Power testified that they left the meeting believing Redeker's concerns had been resolved. According to Redeker, however, J. Jennings acknowledged that CSI's compliance was questionable and stated that reclassifying the field representatives as employees would be too expensive. J. Jennings said that CSI was legally protected, notwithstanding the company's questionable compliance, because the field representatives contractually agreed to be independent contractors and CSI exploited "loopholes" in state laws. In the month following the meeting, Redeker received a pay raise.

Redeker continued to spend time on the classification issue. On January 26, 2010, he wrote a long e-mail to Power memorializing his version of the November meeting. In it, he stated that he had further researched the classification issue and had contacted officials in three states to discuss CSI's compliance. He also urged CSI to research state laws further to ensure that it was acting legally. Redeker conveyed his concerns to CSI's outside counsel, Gabriel Levine.

Power found the January 26 e-mail to be "really negative" and "kind of shocking," since he had believed the issue was resolved. Upon receiving the e-mail, he forwarded it to the Jenningses, who decided to review Redeker's other e-mails on the corporate servers.

In reviewing Redeker's e-mails, CSI discovered that Redeker had forwarded an electronic file containing a list of CSI's field representatives (the field-representatives file) from his work e-mail account to his personal e-mail account in early January. CSI

2

considered the list of field representatives important and confidential: J. Jennings testified that it was one of CSI's "two most prized possessions," along with the company's customer list. In a confidentiality agreement that Redeker had signed after CSI hired him, he agreed to "not, except in performing [his] duties, remove or copy any confidential information or materials . . . without [CSI]'s written permission."

Redeker had obtained the field-representatives file in December 2009 while he was working on a different project he had undertaken without CSI's direction or permission. In that project, Redeker used the file to check the names of field representatives against names in publicly available sex-offender databases. The field-representatives file had been sent to Redeker at his request by CSI's information technology manager. The day he received the file, Redeker and another employee, Lynda Harrison, began checking the names on the list against names in the sex-offender databases. Later that day, Redeker e-mailed Power, who was on vacation, to notify him that the search had resulted in three matches.

On January 5, after Power had returned from vacation, Redeker again e-mailed Power to tell him that there were three matches with about half the list checked. The next day, at 8:27 a.m., Redeker e-mailed Power again and asked whether Redeker and Harrison should keep checking to finish the list. In that e-mail, Redeker noted that CSI had deactivated one of the three field representatives whose names were included in the sex-offender databases, but that the other two continued to receive assignments.

At 10:51 a.m., Power responded, "Let's hold off until I have discussed the situation with the Jennings [*sic*]. I'll get back to you next week." The parties agree that Power and Redeker then had a conversation about the project later the same day, but they disagree about what was said. Power says he told Redeker to stop the search. Redeker says that Power agreed to let him work on the project at home that evening.

At 4:00 p.m., Redeker e-mailed Power again. He thanked Power "for handling these very sensitive issues with others in CSI's senior management team." He also wrote, "I recognize the need to discuss and fully evaluate at the appropriate time the critical business issue of background checking, but why would CSI not want to immediately

3

deactivate the other two reps who we're pretty sure are convicted criminals?" He expressed concern that CSI was still sending the remaining two field representatives out on jobs, although he recognized that it was Power's decision to make. At 4:47 p.m., Redeker e-mailed the field-representatives file to his personal e-mail account.

The next morning, on January 7, Power responded to Redeker's 4:00 p.m. e-mail from the previous day: "I agree, I actually spoke to [the Jenningses] yesterday and Brian will be deactivating these reps today . . . . I have spoken to [Harrison] and she will continue checking the remainder of our reps. We will be doing a search on all newly added reps and we will set up an annual process as well. [¶] Thank you for your efforts, they are greatly appreciated."

The review of Redeker's e-mails revealed two other notable exchanges. In the first, Redeker told a new employee that "CSI isn't concerned that it provides sex offender convicted felons to work for customers," citing the fact that only one of the three field representatives whose names were included in the sex-offender databases had been deactivated. In the second, Redeker sent Harrison a link to a book excerpt "about the Death Spiral and weakening of the organizational immune system," asking that she "let [him] know if [she had] ever seen such anywhere in real life." Both Jenningses testified that these e-mails actually played little, if any, role in the decision to terminate Redeker.

On the morning of March 15, 2010, Redeker used his CSI computer to send an e-mail from his personal account to his own attorney, seeking advice about the classification issue and expressing concern about possible retaliation. Later that day, his employment with CSI was terminated. The termination letter stated that the reasons for termination "include[d Redeker]'s disparagement of [CSI] to other employees, and [his] removal of highly confidential and proprietary information from company property without permission, in violation of [CSI's] policies and [his] Confidentiality Agreement."

Redeker brought suit against CSI. CSI moved for summary judgment or, in the alternative, summary adjudication of his claims. The trial court granted CSI's motion for summary judgment on all claims, and Redeker timely appealed.

4

## II.
### DISCUSSION

A.      *Standard of Review.*

In this appeal, Redeker challenges the summary judgment entered against him. The standard for reviewing a grant of summary judgment is well-established. Summary judgment is appropriate if "there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Our review of the record is de novo. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) We "liberally constru[e] the evidence," including drawing all reasonable inferences from it, in favor of the nonmoving party, and "resolv[e] doubts concerning the evidence" in that party's favor as well. (*Id.* at pp. 460, 470.) We are also mindful that "many employment cases present issues of intent, and motive, . . . issues not determinable on paper. Such cases . . . are rarely appropriate for disposition on summary judgment." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286.) "If summary judgment was properly granted on any ground," however, "we must affirm regardless of whether the court's reasoning was correct." (*Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1836.)

B.      *Summary Adjudication of the Two Wrongful Termination*
         *Claims Was Improper.*

1.      The legal standards governing the wrongful
         termination claims.

Redeker brought two direct claims for wrongful termination. The first, wrongful termination in violation of public policy, requires him to show that his termination "violate[d] fundamental principles of public policy." (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170.) In order for a public policy to be sufficient to support a *Tameny* claim, the policy "must be: (1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 894.) In addition, there must be a sufficient "nexus" between the adverse

5

action and the violation of public policy.  (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1258.)  The nexus requirement is generally satisfied when an employer retaliates against the employee in violation of the policy.  (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 250, pp. 325-326.)

Redeker's second cause of action is for wrongful termination in violation of Labor Code section 1102.5,[1] which prohibits retaliation against employees who engage in whistleblowing and related activities.  Under subdivision (b), "[a]n employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."  Under subdivision (c), "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."[2]

Claims for retaliatory termination in violation of public policy or under section 1102.5 are both analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109 [retaliatory termination in violation of public policy]; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [section 1102.5].)  First, the plaintiff must establish a prima facie case by showing " '(1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link between the protected activity and the employer's action.' "  (*Loggins* at p. 1109; see *Akers* at p. 1453.)  The employer must then present evidence that it had "a legitimate, nonretaliatory reason for the adverse employment action."  (*Akers* at

[1] Unless otherwise noted, all further statutory references are to the Labor Code.

[2] Redeker also pleaded a violation of section 1102.5, subdivision (a), which prohibits the enactment or enforcement of policies against employees' disclosure of information to government agencies.  The parties and the trial court did not consider the applicability of this subdivision when litigating the motion for summary judgment, and we accordingly express no opinion whether it may be a basis for liability.

6

p. 1453; see *Loggins* at p. 1109.) The burden then shifts "back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual." (*Loggins* at p. 1109; see *Akers* at p. 1453.)

The order of proof under *McDonnell Douglas, supra,* 411 U.S. 792 shifts somewhat when an employer brings a motion for summary judgment. (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160.) In this context, the employer must "either (1) negate an essential element of [the employee]'s prima facie case . . . or (2) establish a legitimate, [nonretaliatory] reason for" the adverse employment action. (*Ibid.*) If the employer makes the required showing, the employee must then offer "substantial evidence" of pretext or intentional discrimination. (*Ibid.*)

CSI moved for summary adjudication of the second cause of action (the § 1102.5 claim) on the ground that the company had legitimate nonretaliatory reasons for the termination that Redeker could not show were pretextual. CSI asserted the first cause of action (the *Tameny* claim) was predicated on a violation of the policy embodied in section 1102.5 and failed because the second cause of action failed.[3]

> 2. There is a dispute of material fact whether CSI's claim that Redeker violated his confidentiality agreement was a pretext for his termination.

To demonstrate that an employer's proffered reason for terminating an employee is pretextual, the employee may show that "the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate the discharge." (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224.) The employer's "true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility [citation], the ultimate issue is simply whether the employer acted with a motive to discriminate illegally." (*Guz v. Bechtel National, Inc.*

---

[3] We take no position on whether the parties and trial court correctly assumed that Redeker's first and second causes of action are governed by the same analysis, but we accept that any distinctions are inconsequential for purposes of resolving this appeal.

7

(2000) 24 Cal.4th 317, 358, italics omitted; see also *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 436 ["It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case"].)

The trial court concluded that CSI had offered evidence of a legitimate nondiscriminatory reason for terminating Redeker—that he violated his confidentiality agreement by sending the field-representatives file to his personal e-mail account when he lacked permission to continue the search for sex offenders—and that the e-mails between Redeker and Power regarding the sex-offender issue supported CSI's contention that Redeker lacked permission to continue the search.[4] According to the court, Redeker's testimony that he had permission to take the list and continue the search was "by itself . . . not sufficient to raise a triable issue that the reason for his termination was pretextual," and he had offered no other evidence that CSI's proffered reason should not be believed.

We conclude that there is an issue of material fact whether Redeker had permission to continue the search. According to Redeker, he and Power spoke in person between Power's 10:51 a.m. e-mail and Redeker's 4:00 p.m. e-mail, and during this conversation Power gave him permission to continue the search. Assuming, as we must, that this is true, we conclude that Redeker's comment in the 4:00 p.m. e-mail that he

---

[4] The trial court believed that section 1102.6 required CSI "to prove a legitimate reason for termination . . . by the higher standard of 'clear and convincing evidence.' " We disagree. Section 1102.6 provides that in an action under section 1102.5, "once it has been demonstrated by a preponderance of the evidence that an activity proscribed by [s]ection 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by [s]ection 1102.5." Section 1102.6's clear-and-convincing standard applies only when it has been proven that retaliation was a "contributing factor" to the employee's dismissal, and the employer would have taken the adverse action even if retaliation had not been a motive. Section 1102.6 is inapplicable in this case because it has never been determined or conceded that retaliation was a "contributing factor" to Redeker's termination.

8

"recognize[d] the need to discuss and fully evaluate at the appropriate time the critical business issue of background checking" is not *necessarily* an acknowledgement by Redeker that he needed to stop working on the project immediately. Instead, the comment can be read as a recognition that it would take time for CSI to formulate a policy going forward for dealing with background checks. As a result, a genuine question of material fact exists even if Power did not authorize the search between 4:00 p.m. (when Redeker sent the e-mail) and 4:47 p.m. (when Redeker sent the field-representatives file to his personal e-mail account).

It is also possible to harmonize Power's January 7 e-mail to Redeker with Redeker's version of events. The trial court reasoned that it would have been unnecessary for Power to state that he had spoken to the Jenningses and that "Brian will be deactivating these reps today" if, as Redeker testified, Power had already told Redeker that B. Jennings had deactivated one of the three field representatives. But given Redeker's stated concern in the 4:00 p.m. e-mail that two field representatives remained active, Power's statement can be read as referring to them, not to all three field representatives. In addition, Power's telling Redeker that B. Jennings had deactivated a representative does not necessarily mean that Power told Redeker he had discussed with both Jenningses how to deal with the sex-offender issue going forward.

The trial court also believed that if Power had agreed to let Redeker continue the search, "there would [have been] no need for Power to inform [Redeker] that he was assigning [Harrison] that task," and that "Power would reasonably have directed [Redeker] to stop his search now that [Power had] assigned the task to [Harrison]." But this goes too far in interpreting the exchange in CSI's favor. Power's informing Redeker that Harrison "will continue checking the remainder of our reps" does not necessarily require an interpretation that Redeker was being directed to stop working on the project. Moreover, it is possible that Harrison was assigned the task *after* Power gave Redeker permission to continue the search but *before* Power sent his e-mail the next day. As a result of these possibilities, we conclude that there is an issue of material fact whether

9

Redeker had permission to continue the search when he e-mailed the file to himself and thus whether he violated his confidentiality agreement.

CSI contends that J. Jennings had a good-faith belief that Redeker violated his confidentiality agreement, and this is sufficient to preclude Redeker from showing that CSI's proffered reason for terminating Redeker was pretextual. We agree that Redeker did not satisfy his burden of showing pretext simply by showing that he might not have violated his confidentiality agreement. "[The employer's] true reasons [for the termination] need not necessarily have been wise or correct. [Citations.]" (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 358.) We conclude, however, that Redeker has introduced sufficient evidence to raise a genuine issue whether the asserted reason for his termination was a pretext.

To begin with, the evidence shows that Redeker was terminated within weeks of his sending the January 26 e-mail. The temporal proximity between an employee's protected activity and an adverse employment action may support an inference of retaliation (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479), although timing "*alone* is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353, italics added.) Still, timing may well be a relevant factor in establishing pretext, particularly where, as here, the employee has a good performance record before engaging in the protected activity. (See *ibid.*)

CSI argues that the timing of Redeker's termination does not suggest pretext because Redeker first raised his concerns about the classification issue soon after he began working, but he was not monitored or terminated until months later. As Power acknowledged, however, the January 26 e-mail "changed the tone" of the classification issue. The January 26 e-mail was apparently the first time Redeker disclosed to his employer that he was so concerned about the issue that he had been discussing it with government agencies—a protected activity under section 1102.5. The resulting review of Redeker's e-mails, and Redeker's termination within weeks of the January 26 e-mail,

lends credence to the possibility that CSI's proffered reason for the termination was a pretext.[5]

Additional evidence supporting a possible inference of pretext is the uncontroverted fact that CSI began monitoring Redeker's e-mail *because* Redeker sent the January 26 e-mail to Power. It is possible to infer that CSI reviewed Redeker's e-mails because it "was engaged in a search for a pretextual basis for [termination], which in turn suggests that the subsequent [termination] imposed was for purposes of retaliation." (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1062.) While the monitoring may have been reasonable and nonretaliatory, it was not necessarily so. CSI has not introduced any evidence that it monitored other employees' e-mail. In fact, J. Jennings testified that he could not recall any such surveillance of any other employee.

Finally, CSI's failure to investigate Redeker's alleged misconduct revealed by the e-mails also raises the possibility that the stated reason for the termination was a pretext. CSI contends that J. Jennings honestly believed Redeker lacked permission to continue the sex-offender search based on his review of the e-mails between Redeker and Power, and that J. Jennings did not know about any permission that Power may have given Redeker to continue the search. Redeker disputes CSI's contention that Power was not involved in the termination decision, citing evidence that Power and the Jenningses met daily for discussions. But even if we assume that J. Jennings never spoke to Power about whether Redeker had permission to continue the search, the decision to fire Redeker without getting more information could be suggestive of possible pretext. (See *Nazir v. United Airlines, Inc.*, *supra*, 178 Cal.App.4th at p. 280 ["An employer's failure to

---

[5] In contrast, the timing between Redeker's March 15 e-mail to his attorney and his termination is not suggestive of pretext based on the evidence currently before us. Redeker has offered no proof (except the timing itself) to contradict CSI's evidence that it did not monitor e-mails sent on its system from his personal account. In subsequent proceedings Redeker may be able to present evidence showing that CSI terminated him in part because of the e-mail to his attorney, but we do not rely on that e-mail's timing in concluding that there is an issue of material fact whether CSI's stated reason for the termination was a pretext.

11

interview witnesses for potentially exculpatory information evidences pretext"].) CSI contends that J. Jennings had no reason to investigate, because he was unaware that Redeker claimed he had permission to continue the search, and the e-mail evidence established he did not. But as discussed above, the e-mail exchange between Redeker and Power does not foreclose the conclusion that Redeker *was* given permission to continue the search. This evidence creates a triable issue whether the perceived violation of the confidentiality agreement was the true reason for Redeker's termination or pretext for retaliation.

C.     *The Unfair Business Practices Claim Survives with the*
       *Wrongful Termination Claims.*

In its summary judgment motion, CSI offered no independent argument on Redeker's claim under Business and Professions Code section 17200. Rather, CSI simply argued that the viability of the claim depended on the wrongful termination claims. The trial court agreed and granted summary adjudication on this claim since it had granted summary adjudication on Redeker's wrongful termination claims. Because we reverse the summary adjudication of Redeker's wrongful termination claims, we also reverse the summary adjudication of his claim for unfair business practices.[6] (See *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1426 [holding that plaintiff who stated claims for discrimination under civil rights statutes had also stated claim under Business and Professions Code section 17200, which broadly prohibits " ' " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " [Citation.]' "])

D.     *Summary Adjudication of the Invasion of Privacy Claim Was*
       *Proper Because Redeker Had No Reasonable Expectation of*
       *Privacy.*

Redeker's claim for invasion of privacy under the California Constitution was based on the allegation that CSI saw the March 15 e-mail that Redeker had sent to his

---

[6] Redeker also challenges the exclusion of certain evidence he submitted in opposition to the summary judgment motion. We need not review these evidentiary rulings because they all pertain to his causes of action related to his alleged wrongful termination, and we reverse the summary adjudication of these claims.

personal attorney while it was monitoring his e-mail. The trial court concluded that Redeker possessed no protected privacy interest in the e-mail, failed to establish a serious invasion of any privacy interest, and experienced no injury as a result of any invasion. We agree that summary adjudication of this claim was proper.

A claim for invasion of privacy under California Constitution, article I, section I requires: (1) "a legally protected privacy interest"; (2) a reasonable expectation of privacy; and (3) an invasion of that interest that " 'constitute[s] an egregious breach of the social norms.' " (*Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 278, 287.) Redeker argues that whether he had a reasonable expectation of privacy is an issue for the fact finder. He does not, however, challenge the court's ruling that he failed to establish a serious invasion of his right to privacy and that he did not establish any injury. Either basis alone justified summary adjudication. As a result, we find that Redeker has forfeited his challenge to the summary adjudication on this claim. (See *Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050.)

Furthermore, even if Redeker could establish a serious invasion or an injury, we would conclude that he did not have a reasonable expectation of privacy based on the undisputed facts. When "a legally cognizable privacy interest" exists, "the extent of that interest is not independent of the circumstances," and factors including " 'accepted community norms,' " any "advance notice," and "the opportunity to consent to or reject . . . the invasion" are relevant to the reasonableness determination. (*TBG Ins. Services Corp. v. Superior Court* (2002) 96 Cal.App.4th 443, 449-450.) "[W]hether the circumstances give rise to a reasonable expectation of privacy . . . [is a] mixed question[] of law and fact." (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 370.) As a result, " '[i]f the undisputed material facts show no reasonable expectation of privacy,' " an invasion of privacy claim may be decided as a matter of law. (*Ibid.*)

CSI's employee handbook gave Redeker notice that CSI could monitor personal e-mails sent from CSI's computers. The handbook provided that "[c]omputers, computer files, the email system, and software furnished to employees are CSI property intended

13

for business use . . . . To ensure compliance with this policy, computer and email usage may be monitored." The handbook stated that "[t]he equipment, services, and technology provided to access the Internet remain at all times the property of CSI. As such, CSI reserves the right to monitor Internet traffic, and retrieve and read any data composed, sent, or received through our online connections and stored in our computer systems." The handbook also stated that "[a]ll Internet data that is composed, transmitted, or received via [CSI's] computer communications systems" may be disclosed "to law enforcement or other third parties."

Redeker identifies other evidence that he contends creates a factual dispute about the reasonableness of his expectation of privacy. He cites two other portions of the handbook. The first provides, "While Internet usage is intended for job-related activities, incidental and occasional brief personal use is permitted within reasonable limits." The second provides, "Because CSI is sensitive to the legitimate privacy rights of employees, every effort will be made to guarantee that workplace monitoring is done in an ethical and respectful manner." He also cites B. Jennings's admission that the company never orally told or reminded employees about the policy allowing for monitoring of computer usage, and Redeker's own testimony in which he referred to the e-mail to his attorney as being "private" and "privileged."

Redeker fails to explain how any of this evidence gives rise to a factual dispute. Neither party disputes the handbook's contents, and Redeker does not suggest he was unaware of them or that they did not apply to him. CSI does not contest that it did not inform employees of the handbook provisions except in the handbook itself. Although the parties disagree whether CSI actually reviewed the e-mail to Redeker's attorney, the disagreement is irrelevant to the issue of Redeker's expectation of privacy. Rather, the dispute is whether, under the circumstances that both parties agree existed, Redeker's expectation that the e-mail to his attorney was private was reasonable. This is an issue of law that can be resolved through summary adjudication.

"[T]he use of computers in the employment context carries with it social norms that effectively diminish the employee's reasonable expectation of privacy with regard to

his use of his employer's computers." (*TBG Ins. Services Corp.*, *supra*, 96 Cal.App.4th at pp. 451-452.)  Here, CSI's handbook clearly informed employees that the company could monitor computer usage, which included "retriev[ing] and read[ing] any data composed, sent, or received through [CSI's] online connections and stored in our computer systems."  The handbook also gave notice that such data could be disclosed to third parties.  Personal e-mails sent by CSI's computers fall into this category.  The handbook provision permitting "incidental and occasional brief personal use" of CSI's computers does not, by its terms, limit CSI's ability to monitor data transmitted online.  CSI's promise to do "workplace monitoring . . . in an ethical and respectful manner" cannot reasonably be interpreted to mean that CSI was prevented from monitoring personal e-mail when it had expressly reserved the right to do so.  And the fact that CSI never reminded its employees about its computer usage policies is of no consequence, especially since Redeker does not deny that he was aware of those policies.  We conclude that Redeker had no reasonable expectation of privacy in his personal e-mail sent with CSI's computers since CSI told him that it could monitor data he transmitted online using CSI's computers.  (See *Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1068-1069.)

## III.
### DISPOSITION

The order granting summary judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.

15

_____

Humes, J.

We concur:


_____

Ruvolo, P. J.


_____

Rivera, J.