Filed 3/24/21  Russell v. City and County of San Francisco CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOSEY RUSSELL et al.,<br><br>Plaintiffs and Appellants,<br>v.<br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>Defendant and Respondent. | A159579<br><br>(City & County of San Francisco Super. Ct. No. CGC-17-562245) |

Josey Russell and Nadia Mohamed (collectively, Plaintiffs) are employees of the Police Department (the Department) of the City and County of San Francisco (the City).  They brought this action under the Fair Employment and Housing Act (Gov. Code, § 12940 et seq.; FEHA) alleging the City discriminated against them based on their gender and sexual orientation, unlawfully retaliated against them, and failed to maintain an environment free from harassment.  The trial court granted summary judgment to the City on all causes of action, and Plaintiffs appeal the ensuing judgment.  We shall affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### Plaintiffs' Relationship and Work Assignments

Plaintiffs both work for the Department, Russell as a sergeant and Mohamed as a police officer. Both are women, and they have been in a romantic relationship since 2014.

Beginning in August 2015, Plaintiffs were assigned to the same police station, the Mission Station. They both worked the swing shift, and their shifts overlapped a few days a week. Although Russell was not Mohamed's direct supervisor, she sometimes signed off on Mohamed's police reports and directed her to handle calls for service.

Mohamed became a field training officer (FTO) in 2016 with responsibility to train recruits to perform as solo officers. This role provided an additional $450 or $500 per paycheck. Russell was the training coordinator for the FTO office and was responsible for scheduling and assigning recruits to officers.

### Training of Officer Newman

In September 2016 a recruit, Officer Newman, was assigned to the Mission Station for field training. Newman's father was a lieutenant with the Department, which also employed three other members of Officer Newman's extended family.

In October 2016, Russell assigned Mohammed to train Officer Newman during "phase two" of his training. Another sergeant, Sergeant Petuya, was his phase two FTO sergeant. In phase three of his training, Newman was assigned to Officer Prieto, with Russell as his FTO sergeant. Both Mohamed and Russell documented problems with Newman's performance during his training, as did others with responsibility for training Newman.

After completing phase two of his training, on December 27, 2016, Officer Newman wrote a memorandum to the commanding officer of the training academy, raising concerns about the training he had received from Mohamed. He said Mohamed did not evaluate his work fairly or impartially, that she questioned his competence and his integrity, accused him of lying in a police report, told him he was sexist and abused his powers over detainees, and avoided speaking with him. He said he had felt compelled to sign "Daily Observation Reports" from Mohamed, although he did not agree with the reports, because of the romantic relationship between Mohamed and Russell. Now in phase three, he asked to be assigned to a new FTO sergeant or a new training station. In a second memorandum the same day, he reported that a lieutenant had told him he did not have to sign Daily Observation Reports if he disagreed with their contents. In a third memorandum, on January 8, 2017, Officer Newman reiterated these complaints and said that his current FTO officer was also unduly harsh on him, raising officer safety and civil rights issues and evaluating him unfairly.

Officer Newman spoke with his father, who told him Plaintiffs might be in a relationship and he should not "address anything" to Russell, although Newman had previously found Russell to be approachable, helpful, and an asset to all the recruits. Newman noticed that Russell and Mohamed drove into work together and spent time together, and he was told that they were a couple. Because of this, he testified, and because Sergeant Petuya and Russell were friends, he did not feel comfortable raising his concerns about the way he was being treated during phase two with his supervisors, but chose to submit the written complaint instead.

*Plaintiffs' 2017 Complaints*

Weeks later on February 17, 2017, Russell wrote a lengthy memorandum to Captain Peter Walsh alleging she was being retaliated against because Officer Newman, whom she described as a " 'Legacy kid,' " was not receiving passing scores in the FTO program. She complained that Newman's father, Lieutenant J. Newman, and other family members had made numerous phone calls to the field training office and the Mission Station to ensure Officer Newman passed the FTO program, and that Lieutenant Newman told her superiors that she and Mohamed were in a lesbian relationship and were conspiring to cause Officer Newman to fail the FTO program. According to Russell, she had been forced to have closed-door discussions with her superiors and forced to discuss her personal life and her relationship with Mohamed. She also said her supervisors had questioned officers with whom she was friendly, as well as other sergeants, as to whether the rumors of a romantic relationship between her and Mohamed were true. A lieutenant suggested that she change her schedule because of the alleged relationship with Mohamed and told her their relationship was common knowledge, to which she replied it was a rumor.

Another lieutenant, Lieutenant Caturay, spoke to Russell privately and told her that others had noticed her relationship with Mohamed and had seen Mohamed and her patrol partner hanging out in the sergeant's office, and that some believed Russell gave Mohamed preferential treatment. Russell's memorandum states Lieutenant Caturay could cite no specific instance where she had given Mohamed preferential treatment, that other officers involved in the FTO program had also given Officer Newman bad marks without being accused of improperly conspiring against him, that male officers had hung out with male sergeants in the Sergeants' room, and that there were

4

opposite-sex couples at Mission Station that had not been similarly "talked to" because nobody had "complained about them."

In her memorandum, Russell also raised complaints about inappropriate conduct at the station. She said Lieutenant Caturay had made inappropriate jokes during line-up; for example, when speaking with Russell and two other sergeants about how to deal with the increase in prostitution in the district, he said they should " 'just stick a finger in the dyke.' "[1] Another lieutenant, Lieutenant Burke, referred to a female-to-male transgender sergeant as "her" rather than "him," even after Russell corrected him. Russell also said she had seen a screen shot of Newman's Facebook page, at a time when it contained a homophobic slur.

Mohamed, too, made complaints about Lieutenant Caturay in February 2017, saying she felt he was harassing and retaliating against her. As examples, she pointed to two incidents, one in October 2015 and one in February 2016, when he raised concerns about her not wearing the correct jacket. After Mohamed gave failing grades to Officer Newman in November and December 2016 and Newman's father, Lieutenant Newman, contacted the lieutenants and captain of Mission Station, Caturay singled her out by asking Mohamed's current recruit if he felt Mohamed was neglecting him, and Caturay asked officers about her sexual orientation and personal relationships. Mohamed said she believed Lieutenant Caturay was targeting her for her race, sex, and sexual orientation, and she requested an investigation.

Others also began to treat Officer Mohamed unfairly, she thought. Her superiors had already reviewed the Daily Observation Reports she wrote

---

[1] Because this alleged comment was spoken, it is unclear whether the term should be spelled "dyke," as Plaintiffs do, or "dike," as the City does.

5

regarding Newman's training and commended her for them, but in January 2017 they reversed course and summoned her for counseling. Sergeant O'Connor of the field training program raised with Mohamed several instances in which he thought she should have intervened more quickly while training Newman. This was in spite of the fact that failure to intervene had not been an issue previously brought up in training FTO's, according to Mohamed's patrol partner, who was also an FTO. After this reprimand, Mohamed testified, Sergeant Montoya began giving her assignments that required her to leave the district, and her recruits were assigned to take rape reports and domestic violence reports, all tasks that "nobody wants." Mohamed thought Montoya was retaliating against her and singling her out. She testified that Officer Prieto, who is male, took Officer Newman's gun in a misguided attempt to impress on the recruit a lesson about officer safety but was not disciplined for doing so. Another officer testified that she heard Sergeant Montoya comment, in a manner directed at Russell or Mohamed, " 'She may have won the battle, but I will win the war.' " Although Montoya denied making that statement, we take it as true for purposes of deciding this motion.

The Department ultimately concluded Mohamed's allegations, as well as complaints she made later, either were untimely or did not raise an inference of harassment, discrimination, or retaliation and did not merit further investigation.

Before Newman's complaint, Mohamed had chosen not to disclose her sexual orientation at work out of concern that the Department treated the LGBTQ community poorly. She testified at her deposition that some of her co-workers thought being gay was "disgusting," and she reported a

6

conversation in which another officer said lesbians did not have sex " 'the right way.' "

### *Mohamed's Transfer to Central Station*

The Department's Human Resources Manager received a copy of a policy the San Francisco Civil Service Commission adopted in February 2017, which prohibited employees from making, participating in making, or influencing an employment decision involving a " 'related person,' " a category that includes those in romantic relationships. The Department then issued a bulletin entitled " 'Policy on Family and Romantic Relationships at Work' " in April 2017. The policy prohibited employees from supervising the work of any related person and required employees to report to the manager if they directly or indirectly supervised a related person.

Pursuant to the new policy, Plaintiffs reported their relationship to the Department in May 2017. The Department then transferred Mohamed to another station, the Central District Station, which was also a training station that would give Mohamed the opportunity to continue acting as an FTO. Her rank, pay, and patrol duties did not change, except that the Central Station received fewer recruits than the Mission Station, so she had fewer opportunities to work as an FTO.

Through her attorney, Mohamed complained about the transfer, arguing the Central Station was less favorable than the Mission Station, that she would lose income from less frequent FTO opportunities, and that the locker she was assigned was next to that of a Sergeant Newman, a relative of Officer Newman. Also, Officer Nicholas Buckley testified at his deposition that the reputation of Central Station was that "people that have issues are there." The transfer order indicated Mohamed's transfer was by " 'chief's order,' " which Mohamed believed suggested the transfer had been the result

7

of a disciplinary action.  The Chief of Police stated in a declaration that he did not know of Mohamed and Russell's complaints when he decided to transfer Mohamed to Central Station.  He described matters slightly differently in his deposition, testifying that the complaints were not a consideration when he decided to transfer Mohamed.

Before Mohamed was transferred, the Department's human resources manager, Benjamin Houston, determined that some of Russell's and Mohamed's shifts overlapped.  He did not look into how many shifts they worked together and into whether Russell directly supervised Mohamed.  He recommended that the conflict be resolved by transferring the subordinate officer, i.e., Mohamed, and did not consider having them assigned to different shifts at the Mission Station.

One other couple in the Department reported a romantic relationship involving employees at the same active duty station in which one supervised the other, in that case a woman and a man.  To bring that couple into compliance with the policy, the Department also reassigned the lower-ranking employee, a man, to another station.

On January 24, 2018, Mohamed submitted a request to be transferred out of the Central Station, explaining that a few months after her transfer to the station, an Arab officer was "targeted for hate" and was immediately transferred.  Because Mohamed, who is African American, also has a Muslim name, she asked to be transferred as well.  Her request was granted, but not until June 2018.

### Investigations After Plaintiffs' Complaints

Mohamed was investigated or disciplined on a number of occasions after Newman raised his concerns about her and Russell.  Plaintiffs contend

8

these incidents were due to her sexual orientation, and that other officers were not disciplined for similar behavior.

In March 2017, Sergeant Montoya had a counseling session with Mohamed after a lieutenant, Lieutenant Gutierrez, told him that Mohamed showed disrespect when addressed by her superiors; specifically—unlike the other officers—during lineup she did not come to attention when called to do so, she would turn as if she was ready to leave before being dismissed, and she would roll her eyes when information was being given. Montoya's memorandum regarding the session indicated Mohamed raised her voice and became defensive and argumentative. Another sergeant who was working in the room during the counseling session, Sergeant Petuya, confirmed in his deposition that Mohamed got "a little defensive," but did not recall her raising her voice. In his deposition, Montoya testified that saluting during lineups was not a written policy but "more of a tradition"; that he and other officers sometimes did not salute at the end of lineups, depending on who was in charge; that Gutierrez was "more old school" and liked officers to salute; and that Mohamed was the only officer he had seen fail to salute Gutierrez. He also testified that when counseling other officers for violating the Department's grooming policy, he spoke to the officer more than once before putting the matter in writing.

Mohamed submitted a rebuttal to Sergeant Montoya's account of the counseling session on April 27, 2017. She said Sergeant Montoya had told her angrily during the counseling session that she needed to improve her attitude, but did not give examples of how she needed to improve. She contended that for three years she had never saluted, that she had not previously been told she should do so, and that other officers likewise did not salute regularly. She said she was suffering discrimination and retaliation

9

because she would not take part in nepotism, because she was in a relationship with Russell, and because of her sexual orientation.

Sergeant Montoya wrote a memorandum two days later, alleging Mohamed was disrespectful and repeatedly questioned his orders when he directed her to prepare a memorandum about a collision involving a police car in which she was a passenger. Montoya recommended the matter be forwarded to Internal Affairs for investigation. In a declaration, Mohamed averred she had never previously been required to write a statement—rather than giving a verbal report—when a recruit was involved in a non-injury collision, and that she did write the statement as ordered. According to Montoya, Lieutenant Gutierrez ordered him to write the memorandum and refer it to Internal Affairs. Mohamed was reprimanded and ordered for retraining on the Department's rule regarding respectfulness toward superiors in September 2017, and the information was placed in her personnel file.

In May 2018, Mohamed was admonished and retrained as a result of an incident on January 23, 2017 in which a citizen complained she did not display her star on her outermost garment and refused to provide her name and star number during a service call after a traffic accident. This was in spite of the fact that Mohamed had previously participated in mediation, apparently with the complainant, and had been informed in August 12, 2017 that the case was closed.

Russell was also the subject of several Internal Affairs investigations in 2017. In connection with the January 23, 2017 incident that led to Mohamed being reprimanded, Russell was investigated for failing to submit a citizen complaint form to the Office of Citizen Complaints, for muting her body worn camera while speaking with the citizen, and for showing preferential

10

treatment to Mohamed. She was reprimanded in August 2018 and retrained. According to the notice of intent to impose discipline, Mohamed and her partner responded to the collision, and a person involved in the collision, Ms. Donofrio, requested a supervisor. Russell came to the scene, and Donofrio said she would like to make a complaint against Mohamed. Although Russell was " 'supportive,' " she did not actually take the complaint and did not tell the lieutenants on duty about the complaint. She muted her body worn camera during his conversation with Donofrio. This conduct, the Department concluded, constituted neglect of duty for failing to take the complaint and for muting her camera.

There are several things about this disciplinary action that are troubling. Russell testified that Lieutenant Caturay investigated the January 23, 2017 incident himself, that he called Donofrio months after the incident and asked leading questions of Donofrio when she said nice things about how Russell had handled the call, and that it was not a normal practice for a lieutenant to try to elicit a complaint from a citizen. Russell also testified that at the accident scene she had gone out of her way to explain to Donofrio the process for making a formal complaint, and that Donofrio had declined to do so at that time, saying she preferred to go home and consider it further before deciding to lodge a complaint. Finally, Russell testified, and Lieutenant Gutierrez confirmed, that the policy establishing standards for muting body worn cameras did not come into effect until several months after the incident, and neither Russell nor Gutierrez was aware of anyone being counseled or reprimanded for muting their camera before the change in policy.

In June 2017, Internal Affairs investigated Russell for improperly inspecting Mohamed's Performance Improvement Plan (PIP) binder, a

confidential personnel record. She was admonished and retrained in April 2018, but her job duties and salary were not affected. The order to admonish and retrain her explained that Russell examined the binder at Mohamed's request and that Russell believed it was permissible to review it in those circumstances, but that the Department's manual "only permits sergeants to review PiP folders of those members in their group." The order noted the admonishment "does not constitute discipline." (Italics omitted.) As evidence that Russell did not act improperly, Plaintiffs point to the deposition testimony of Chief of Police William Scott that he thought there could be situations in which an officer could give permission to someone not her direct supervisor to inspect her PIP binder; to Sergeant Montoya's testimony that he had sometimes placed documents in the PIP binders of officers whom he did not supervise directly; and to Sergeant Petuya's testimony that as far as he knew, he could look into the binder of someone for whom he was not the PIP sergeant.

Russell was investigated a third time, along with other sergeants, for failing to take appropriate action when officers were watching a pornographic video that was not work-related in August 2017; three officers were also investigated for watching the material. The case was closed for insufficient evidence and no further action was taken. Russell believed Sergeant Montoya brought the complaint anonymously and included her as retaliation, and she testified she was off duty the day of the alleged incident.

Sergeant Montoya also made a complaint alleging Russell made an inappropriate comment in front of other officers insinuating that, as a gay man, he might have HIV. When Russell learned of the complaint in December 2017, she denied having made such a comment, and again concluded Montoya's complaint was retaliatory. Nothing came of Montoya's

12

allegation except that on December 30, 2017, Russell was made to sign a statement that she understood retaliation was prohibited.

*Procedural History*

Plaintiffs brought this action against the City, alleging causes of action for unlawful discrimination based on gender and sexual orientation, unlawful retaliation for engaging in activity protected under FEHA, failure to maintain an environment free from harassment, and unlawful discrimination against Mohamed based on race.

The City moved for summary judgment. The trial court granted the motion. It ruled that all causes of action failed because Plaintiffs could not demonstrate an adverse employment action, that Plaintiffs had failed to demonstrate more than isolated and sporadic remarks that did not amount to harassment, that there was no evidence Chief Scott harbored any animus toward Plaintiffs, and that the evidence was not susceptible to a " 'cat's paw' " theory of liability as numerous people were involved with Plaintiffs' discipline. The court further concluded Mohamed had failed to exhaust administrative remedies on her claim of racial discrimination, a conclusion Plaintiffs do not contest on appeal. The court entered judgment accordingly. This timely appeal ensued.

**DISCUSSION**

## I. Legal Standards

Our standard of review is well settled. We review the grant of summary judgment de novo, deciding independently whether the undisputed facts negate the Plaintiffs' claims. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253 (*Nazir*).) We review the evidence in the light most favorable to the Plaintiffs, liberally construing their evidentiary submissions

13

and resolving any evidentiary doubts or ambiguities in Plaintiffs' favor. (*Id.* at p. 254.)

California uses a burden-shifting procedure to resolve employment discrimination cases. The plaintiff has an initial burden to establish a prima facie case of discrimination by showing actions taken by an employer from which it can be inferred, if the actions are not explained, that it is more likely than not the actions were based on an improper discriminatory criterion. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–355 (*Guz*).) This showing generally requires evidence that the plaintiff was a member of a protected class, that she was qualified for the position sought or was performing competently, that she suffered an adverse employment action, and that some other circumstance suggests the motive was discriminatory. (*Id.* at p. 355.) An adverse employment action is not shown by "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054 (*Yanowitz*).) But "adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion" is sufficient. (*Id.* at pp. 1054–1055.)

If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce admissible evidence sufficient to raise a genuine issue of fact that the action was taken for a legitimate, nondiscriminatory reason. (*Guz, supra*, 24 Cal.4th at pp. 355–356.) If the employer does so, the presumption of discrimination disappears and, to prevail, the plaintiff has the burden to offer substantial evidence that the stated nondiscriminatory reason was untrue or pretextual, or evidence the employer acted with

14

discriminatory animus, or a combination of the two. (*Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1007 (*Foroudi*); *Guz*, at p. 356.)

In the context of summary judgment, this framework is modified. The employer, as the moving party, " ' "has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." ' " (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 577 (*Ortiz*).) If the employer does so, the burden shifts to the employee to demonstrate a triable issue of fact with " ' "substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." ' " (*Id.* at pp. 577–578.)

Although " 'an employee's evidence submitted in opposition to an employer's motion for summary judgment is construed liberally, it "remains subject to careful scrutiny." [Citation.] The employee's "subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." [Citation.] The employee's evidence must relate to the motivation of the decision makers and prove, by nonspeculative evidence, "an actual causal link between prohibited motivation and termination." ' [Citation.] Moreover, the 'stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory motive.' " (*Foroudi, supra*, 57 Cal.App.5th at pp. 1007–1008, quoting *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1159 (*Featherstone*).)

15

To show an employer's stated reasons are pretextual, it is not enough simply to " 'show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005, accord*, Featherstone, supra*, 10 Cal.App.5th at p. 1159.) Instead, the employee must " 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence[]" [citation], and hence infer "that the employer did not act for [] [the asserted] non-discriminatory reasons." ' " (*Hersant*, at p. 1005, bracketed deletions added.)

The rules for resolving retaliation claims under FEHA are similar. To establish a prima facie case of retaliation under FEHA, a plaintiff must show she "engaged in a 'protected activity,' the [employer] subjected [her] to an adverse employment action, and a causal link existed between the protected activity and the [employer's] action." (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 874 (*Thompson*).) A retaliatory motive is proved by showing that the plaintiff engaged in a protected activity, that her employer was aware of the protected activity, and that the adverse action took place within a relatively short time afterward. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 (*Morgan*).) Once the employee meets this burden, the burden shifts to the employer to "offer a legitimate, nonretaliatory reason for the adverse employment action." (*Yanowitz, supra*, 36 Cal.4th at p. 1042.) If the employer does so, the burden returns to the employee to prove intentional retaliation. (*Ibid*.) Pretext may be established either directly by showing a discriminatory reason more likely motivated the

16

employer, or indirectly by showing the proffered reasons are unworthy of credence. (*Morgan, supra,* 88 Cal.App.4th at p. 68.) On summary judgment, the plaintiff must establish a material factual dispute as to whether the employer's conduct was in retaliation for protected conduct. (*Thompson,* at p. 876.)

## II. Adverse Employment Actions

We first consider whether Plaintiffs suffered adverse employment actions for purposes of their causes of action for discrimination and retaliation. The trial court concluded neither Russell nor Mohamed suffered adverse employment actions for purposes of FEHA. (See *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 392 (*McRae*) [letter of instruction not adverse action where there was no evidence it was likely to lead to denial of employment benefits and privileges]; cf., *Jeffra v. California State Lottery* (2019) 39 Cal.App.5th 471, 485 [pretextual investigation may be adverse employment action].) For purposes of summary judgment, we disagree.

An adverse employment action does not mean merely a change contrary to the employee's interests or not to the employee's liking. (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455 (*Akers*); *McRae, supra,* 142 Cal.App.4th at p. 386.) Neither is the concept limited to " 'ultimate' employment acts, such as a specific hiring, firing, demotion, or failure to promote decision." (*Akers,* at p. 1455.) Rather, an employer's action is treated as adverse only if it had a substantial and material adverse effect on the terms and conditions of the plaintiff's employment. (*Ibid.*) This requirement guards against the risk that courts "will be thrust into the role of personnel officers, becoming entangled in every conceivable form of employee job dissatisfaction." (*Ibid.*)

17

In some cases, an employee might be subjected to a series of employment actions, some of which might not, standing alone, constitute a material adverse change in the conditions of employment. (*McRae*, *supra*, 142 Cal.App.4th at p. 387.) In those cases, courts use a totality of the circumstances approach, bearing in mind that there "is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1055; see *McRae*, *supra*, 142 Cal.App.4th at pp. 387–388.)

Thus, in *Yanowitz*, our high court concluded that supervisors' alleged retaliatory acts in actively soliciting negative information about the plaintiff and using the information to criticize her and undermine her job performance constituted "a pattern of systemic retaliation" which, if proved, would satisfy the adverse action element of a prima facie case of retaliation. (*Yanowitz*, *supra*, 36 Cal.4th at pp. 1060–1061.)

In *Akers*, adverse action was shown after a deputy district attorney who had made a complaint of discrimination received a negative performance review and a counseling memorandum accusing her of inefficiency, incompetence, dishonesty, and insufficient productivity—matters that could be " 'career ender[s]' "—was told she would never again work in the domestic violence unit, handling a case type in which she excelled. (*Akers*, *supra*, 95 Cal.App.4th at pp. 1449–1450, 1456.)

But in *McRae*, our colleagues in Division One concluded "a series of events, each bearing little relationship to the others" did not support a finding of retaliation. (*McRae*, *supra*, 142 Cal.App.4th at p. 390.) Commenting on two complained-of events responding to an employee's unauthorized absence from work, the *McRae* court concluded that a supervisor's memoranda to his files and a letter of instruction placed in the

18

employee's personnel file did not, standing alone, rise to the level of an adverse action: they did nothing more than require the plaintiff to remain at her post, and, even if they might later be cited as part of the reason for an employment decision, there was no evidence—unlike in *Akers*—that the employer was likely to deny employment benefits or privileges to an employee who received a letter of instruction. (*McRae*, at p. 392.)

We turn to the facts before us in this case. While it is a close issue, we bear in mind that we must construe the record liberally and resolve evidentiary doubts in Plaintiffs' favor. (*Nazir*, *supra*, 178 Cal.App.4th at p. 254.) Some of the actions of which Plaintiffs complain—including transferring Mohamed to an equivalent position at the Central Station based on the Department's newly enacted policy for romantic relationships, and the closed investigation of Russell for failing to intervene when officers were viewing pornography—do not appear on this record to be adverse for purposes of FEHA, either viewed in isolation or as part of a continuing course of conduct.

But there is at least some evidence that other actions could affect Plaintiffs' opportunities for promotion, and a number of these took place after Plaintiffs raised their complaints in February 2017. Mohamed was counseled for failing to salute; two days after she submitted a rebuttal asserting this allegation was an act of discrimination and retaliation, Lieutenant Gutierrez ordered Sergeant Montoya to write a memorandum accusing her of insubordination and refer the matter to Internal Affairs; and the resulting letter of reprimand for insubordination was placed in her personnel file. Russell and Mohamed were both subject to investigation several months after the January 2017 traffic incident; after Mohamed was originally told the matter had been resolved through mediation, she was nonetheless

19

admonished and retrained, and Russell was investigated by Internal Affairs and received a disciplinary reprimand from the Chief of Police. The record contains evidence that personnel files are reviewed when employees seek promotions, that the personnel files include Internal Affairs reprimands and adjudicated matters, and that Department and Internal Affairs discipline are considered in decisions regarding promotion. These facts, we conclude, suffice to establish a triable issue as to at least the adverse action element of Plaintiffs' causes of action for discrimination and retaliation.

## III. Discrimination and Retaliation

We next consider whether there is a triable issue of fact as to the other elements of Plaintiffs' causes of action for discrimination based on gender or sexual orientation and for retaliation. At the outset, we note that the City does not dispute that Plaintiffs' actions in bringing complaints of discrimination based on gender and sexual orientation are protected conduct under FEHA. (See *McRae*, *supra*, 142 Cal.App.4th at p. 386 [no dispute that filing FEHA claims was protected conduct]; *Akers*, *supra*, 95 Cal.App.4th at p. 1453 [complaining of discrimination based on gender and pregnancy treated as protected].)

*Inquiries into Plaintiffs' Relationship*

Plaintiffs' complaints originated in the questions raised about the nature of their relationship after Officer Newman objected that Mohamed was unfairly harsh on him and said he was uncomfortable complaining about her to Russell. Sergeant Montoya testified that Lieutenant Caturay asked him if Montoya knew anything about Plaintiffs being in a relationship. Caturay testified he had been told about a meeting at which the sergeants discussed Plaintiffs' relationship. He also testified he and another lieutenant had talked about rumors that Plaintiffs were a couple, because it "might

20

become a personnel issue which involves the station." Russell raised complaints that her supervisors questioned officers and other sergeants about whether the rumors about a relationship between herself and Mohamed were true, and that she herself had been "pulled into" closed-door sessions with three lieutenants at the Mission Station and asked about her relationship with Mohamed. While we recognize the personal and sensitive nature of these inquiries and discussions, there is nothing to indicate they were motivated by animus based on Plaintiffs' gender or sexual orientation, as opposed to the potentially relevant fact of a sergeant and an officer at the station being in an undisclosed romantic relationship.

None of the comments Plaintiffs point to persuade us otherwise. Lieutenant Caturay testified that during a conversation about the rumors of Plaintiffs' relationship, Russell became teary-eyed and said he was only questioning her because she "look[ed] like a lesbian," to which he replied he had not "accused" her of being a lesbian. This phrasing, Plaintiffs argue, reveals his bias against their sexual orientation. While the verb choice was unfortunate, Plaintiffs can hardly argue it was inappropriate to inquire into whether they were in a romantic relationship—which, in fact, they were—in response to allegations that Russell had a conflict of interest to the extent she supervised Mohamed.

As to Plaintiffs' cause of action for retaliation, this investigation into whether they were a romantic couple does not support that claim for the additional reason that the investigation preceded their complaints of discrimination based on gender and sexual orientation.

*Mohamed's Transfer*

Plaintiffs also argue that Mohamed's transfer to the Central Station, which she viewed as an unfavorable assignment, was the result of retaliation

21

and discriminatory animus. We are not persuaded that the evidence in the summary judgment record would allow a reasonable factfinder to reach this conclusion. There is no dispute that the City promulgated a policy on family and romantic relationships in February 2017, that the Department shortly thereafter established its own policy, that under the policy it was improper for one Department employee to supervise another employee with whom he or she was in a romantic relationship, and that Russell on occasion found herself supervising Mohamed at the Mission Station. There is nothing to suggest the Department's policy was directed toward Plaintiffs. Only one other couple working at the Department—an opposite-sex couple—found themselves in the same situation, and there, too, the Department transferred the lower-ranking employee to a different station. And the Central Station, although apparently it had fewer recruits than the Mission Station, also allowed opportunities for Mohamed to continue her work as an FTO. Nothing in these events is susceptible to an inference that the reasons the Department gave for the transfer were pretextual for purposes of a cause of action for discrimination or retaliation.

Plaintiffs point out that in the case of the opposite-sex couple who reported a relationship, the lower-ranking employee was transferred to an adjoining station, but Mohamed was not initially transferred to the Bayview Station, which adjoined the Mission Station and which she would have preferred to the Central Station. They note Chief Scott's testimony that if Mohamed had been transferred to an adjoining training station, the Bayview Station, Russell might find herself indirectly supervising Mohamed if they responded to the same call. But the evidence does not show whether the same concern would arise in the case of the other couple, a captain and a police officer, and in any case Mohamed's request to transfer out of the

Central Station was later approved and she was moved to the Bayview Station. Even if Mohamed was initially treated less favorably than the other couple, these facts do not suggest that the transfer was based on Mohamed's gender or sexual orientation or on her previous complaints. Nor does the fact that Mohamed was assigned a locker at the Central Station next to a relative of Officer Newman suggest that her transfer was based on improper factors.

*Other Investigations and Discipline*

Plaintiffs were also subject to investigations and discipline after they complained in February 2017 of retaliation for Newman's failing scores in the FTO program and of discrimination based on their gender and sexual orientation. While it is a close question, we conclude there is no triable issue as to whether these actions were the result of discrimination or retaliation for having complained of discrimination.

The most significant action taken against Russell was the investigation into the January 23, 2017 traffic accident involving Donofrio, which led to her being admonished and retrained. The Department proffered evidence of a legitimate reason for the investigation, that is, that a person involved in the accident claimed that Russell improperly failed to take her complaint against Mohamed, a matter that appropriately gave rise to an investigation. There is also evidence that the Chief of Police had reprimanded other officers including white male officers for violating the Department's policy on body-worn cameras, and that he was unaware of any other officer who had failed to take a citizen's complaint under similar circumstances.

Against this showing, Plaintiffs provided evidence they assert calls into question the basis for the Department's investigation and discipline, that is, that Lieutenant Caturay—contrary to normal practice—called Donofrio personally and asked leading questions to elicit a complaint from her; that in

fact Russell explained the process for making a complaint at the scene of the accident and that Donofrio had declined to do so; and that the policy against muting body worn cameras, which Russell was found to have violated during the incident, did not come into effect until *after* the traffic accident. But, whether or not Caturay's actions were suspect, he did not make the decision to discipline Russell, nor was it he who recommended that Chief Scott impose discipline. Rather, Chief Scott, who has ultimate responsibility for deciding whether to impose discipline, testified in a declaration that complaints of misconduct are sent to Internal Affairs, which conducts an investigation and presents a recommendation to him. Chief Scott also testified Internal Affairs recommended that Russell receive a disciplinary reprimand for this incident, he concurred with the recommendation, and he did not consider as a factor in considering this or any other incident that either Russell or Mohamed had filed complaints. And there is no indication Caturay's statements or recommendation contributed substantially to Chief Scott's final decision. (See *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1251 [declining to impute knowledge of plaintiff's disability to decision maker where there was no evidence any coworker who knew of illness was a " 'substantial contributor' " to decision to discharge him]; *Choochagi v. Barracuda Networks, Inc.* (2020) 60 Cal.App.5th 444, 461 [no triable issue regarding retaliation where evidence failed to show decision makers "acted as mere instrumentalities" of employee with retaliatory motive]; cf., *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 110 [ignorance of decision makers does not "categorically shield the employer from liability if other substantial contributors to the decision bore the requisite animus"].)

By this account, there is no basis to conclude Russell's discipline was the result of her gender, her sexual orientation, or her complaint. No

evidence suggests any employee in Internal Affairs who investigated the incident or recommended discipline knew of, or was influenced by, Plaintiffs' complaints, or that Internal Affairs employees or Chief Scott acted out of animus toward Plaintiffs' gender or sexual orientation. And, as explained in *McRae*, a plaintiff's subjective belief that defendants were lying about their motivations is not sufficient to show retaliation absent "substantial evidence from which the jury can find that defendants' reasons for their actions are false or pretextual." (*McRae, supra,* 142 Cal.App.4th at p. 398.) Plaintiffs have failed to show a reasonable connection between their complaints and the formal discipline imposed on Russell.

As for the other investigations of which Russell complains—regarding Mohamed's confidential PIP binder, officers' improper viewing of pornography, and the alleged HIV comment—these did not result in discipline, and none supports a claim the Department's stated reasons for its conduct were pretextual.

We recognize that these events were distressing to Russell. We recognize also that Russell had received numerous commendations in the past and suffered no previous pattern of discipline. But the evidence is insufficient to support a reasonable inference that animus against Russell's gender or sexual orientation motivated anyone responsible for these events, or that she suffered adverse employment actions in retaliation for conduct protected under FEHA.

We reach the same conclusion about Mohamed's claims of discrimination and retaliation. Sergeant O'Connor of the Field Training Program documented a counseling session he had with Mohamed in January 2017 to discuss several occasions when she should have intervened more quickly while training Officer Newman. But even if this counseling session

25

could be seen as an adverse action, Plaintiffs have not provided evidence the Department was motivated by discriminatory animus when it scrutinized Mohamed's training reports after Newman complained of the treatment he received while assigned to her. (See *McRae, supra,* 142 Cal.App.4th at p. 392 [letter of instruction that has no effect on terms and conditions of employment except to require plaintiff to remain at her post not adverse].) The fact that another officer disarmed the recruit without facing consequences is a sufficiently different circumstance that it does not support an inference of discrimination based on gender or sexual orientation. And this event could not have been in retaliation for Mohamed's complaint about Caturay, which she had not yet made.

Plaintiffs also point to disciplinary actions that took place shortly after Mohamed made her complaint in February 2017. In connection with the January 2017 traffic accident, Mohamed points to a photograph she contends shows she was, in fact, wearing her star on her outermost garment during the call.[2] But the report prepared by Mohamed's partner shows Mohamed did not provide her star number when Donofrio asked for it, and Russell acknowledged to the Department that she—Russell—was the one who gave Mohamed's name and star number to Donofrio. Even recognizing that Mohamed was initially told the matter had been resolved through mediation and was later admonished and retrained, Plaintiffs point to no evidence that would support an inference that the Department's stated reasons for this investigation were pretextual. Nor have they provided evidence that would support an inference that the Internal Affairs employees who recommended

---

[2] Plaintiffs do not explain why the time stamp on the photograph appears to be several hours *after* the incident, but the City makes nothing of this apparent discrepancy.

she be admonished and retrained, or Chief Scott who concurred with those findings, acted out of discriminatory animus or were motivated by her complaints.

On two occasions after she complained, Mohamed was also accused of insubordination, once when she failed to salute Lieutenant Gutierrez in March 2017 and was counseled by Sergeant Montoya, and once when she questioned Montoya's order that she write a report in April 2017. The second event took place two days after Mohamed submitted a rebuttal to Montoya's account of the first incident, complaining she was suffering discrimination and retaliation because of her refusal to take part in nepotism, her relationship with Russell, and her sexual orientation. Against the City's showing that Mohamed was in fact insubordinate, Plaintiffs provided evidence that other officers did not salute regularly and were not disciplined; that Mohamed had never saluted in lineup over the previous three years and had never until then been criticized; that, contrary to Montoya's account, Mohamed did not raise her voice during the counseling session; and that she had never previously had to write a report in similar circumstances.

Despite the proximity in time between Mohamed's complaints and these actions, we conclude the evidence is insufficient to show the investigations were the result of either retaliation for her complaints or discrimination based on her gender or sexual orientation. We recognize that, similar to Russell, Mohamed received recognitions and commendations for outstanding work on several occasions before February 2017, and suffered no pattern of discipline before that date. But both Gutierrez and Montoya testified that, as of the time Gutierrez directed Montoya to counsel Mohamed in April and document his interactions with her, neither knew of Mohamed's or Russell's complaints, and such knowledge is an essential part of proving

27

retaliatory motive. (See *Morgan*, *supra*, 88 Cal.App.4th at p. 69.) Gutierrez and Montoya also testified that neither was involved in conducting the Internal Affairs investigation of Mohamed nor in the ultimate decision to impose discipline. And Chief Scott averred that he did not consider Plaintiffs' discrimination complaints in accepting Internal Affairs' recommendation to issue a disciplinary reprimand. Nothing but speculation untethered to evidence suggests these statements are false.

Our colleagues in Division Two of this court have cautioned that "many employment cases present issues of intent, and motive, . . . issues not determinable on paper [and] rarely appropriate for disposition on summary judgment." (*Nazir*, *supra*, 178 Cal.App.4th at p. 286.) Nevertheless, to continue with their claims after the City has met its burden to produce evidence of a legitimate motive for its actions, Plaintiffs must produce nonspeculative evidence to support a reasonable inference of discriminatory motive (*Foroudi*, *supra*, 57 Cal.App.5th at pp. 1007–1008) or to create a triable issue of a causal link between the protected activity and the adverse action (*Morgan*, *supra*, 88 Cal.App.4th at p. 70). In *McRae*, the court rejected a claim of retaliation where the "allegedly wrongful acts were taken by many different persons, for different reasons, some of which indisputably had nothing to do with [the plaintiff's] protected conduct." (*McRae, supra*, 142 Cal.App.4th at p. 391.) The same is true here. The links Plaintiffs seek to draw between the allegedly adverse actions and either retaliation or discrimination are too tenuous to support their claims.

We conclude, therefore, that Plaintiffs' causes of action for discrimination based on gender or sexual orientation and for retaliation fail. In reaching this conclusion, we acknowledge there is evidence—as when Montoya reportedly said he would "win the war"—that caused Plaintiffs to

28

believe they were being targeted unfairly for refusing to give special treatment to a legacy recruit. But, however reasonable these concerns may have been, they have not shown the requisite connection between adverse employment actions and conduct protected by FEHA.

## IV. Harassment

Plaintiffs' third cause of action is for failure to maintain an environment free of harassment and discrimination. This cause of action requires a showing of actual harassment or discrimination under FEHA. (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925, fn. 4; Gov. Code, § 12940, subd. (k); Cal. Code Regs., tit. 2, § 11023, subd. (a)(2).) We have already concluded Plaintiffs' claim for discrimination fails.

To establish a prima facie case of harassment, an employee must show that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment." (*Ortiz*, *supra*, 37 Cal.App.5th at p. 581; see *Thompson*, *supra*, 186 Cal.App.4th at p. 876.) On this last point, defendants are liable "if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, §12940, subd. (j)(1).)

A showing that the harassment created a hostile work environment requires a showing " 'that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee.' " (*Aguilar v. Avis*

*Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130–131; accord, *Galvan v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 549, 564–565; see also Gov. Code, § 12923, subds. (a) & (b).) Harassment " 'cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature.' " (*Aguilar*, at p. 131.) Put another way, "[t]he law prohibiting harassment is violated '[w]hen the workplace is permeated with discriminatory intimation, ridicule and insult that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' " (*Nazir, supra*, 178 Cal.App.4th at p. 263.)

On these standards, the City has met its burden to show Plaintiffs cannot establish they were subjected to actionable harassment. Russell reported only isolated comments arguably referring to sexual orientation or gender identity—e.g., a lieutenant's comment about "a finger in the d[y]ke," and another lieutenant referring to a transgender sergeant by the wrong pronoun. Mohamed also reported hearing other officers express negative views about gays and lesbians, but there is no evidence she brought this conduct to the attention of a supervisor. (See Gov. Code, §12940, subd. (j)(1).) All of these comments are offensive, hurtful, and entirely inappropriate in the workplace. But there is no evidence that the comments were directed against Russell or Mohamed, that they were pervasive or intimidating, or that they unreasonably interfered with Russell's or Mohamed's work performance. As to the screen shot of Newman's Facebook page containing a homophobic slur, there is no indication Newman posted the offensive language himself or displayed it to Russell or anyone else in the Department; rather, another sergeant, a friend of Russell's and a board member of the Department's Pride Alliance, found it while "snooping" and showed it to Russell.

30

We do not ignore the context of this case—that is, the evidence that after Officer Newman complained about Mohamed and the conflict posed by Russell's relationship with her, members of the Department raised questions about the nature of their relationship. It is not surprising that Plaintiffs found these inquiries into their personal lives, and into matters they had sought to keep private, distressing. But we have already concluded the Department could reasonably investigate the suggestion of an undisclosed conflict of interest that had been raised. And the remaining comments do not rise to the level of actionable harassment.

We recognize the Legislature's admonishment that "[h]arassment cases are rarely appropriate for disposition on summary judgment." (Gov. Code, § 12923, subd. (e); see *Nazir*, *supra*, 178 Cal.App.4th at p. 286.) But rarely is not the same as never, and here the alleged harassing acts are sufficiently isolated and sporadic that the trial court correctly concluded this claim was subject to summary judgment.

## DISPOSITION

The judgment is affirmed. In the interests of justice, the parties are to bear their own costs on appeal.


TUCHER, J.


WE CONCUR:

POLLAK, P. J.
BROWN, J.


*Russell et al. v. City & County of San Francisco* (A159579)


31