Filed 7/16/24  Gebhardt v. City of Fremont CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL GEBHARDT,<br><br>     Plaintiff and Respondent<br><br>v.<br><br>CITY OF FREMONT,<br><br>     Defendant and Appellant. | A167835<br><br>(Alameda County<br>Super. Ct. No. 22CV022860) |

After plaintiff Michael Gebhardt sued his employer, defendant City of Fremont (City), for unlawful retaliation, defendant made a special motion to strike under Code of Civil Procedure section 425.16, the anti-SLAPP statute.[1] The trial court denied the motion, and defendant appeals.  We agree with the trial court only in part, instead concluding that the anti-SLAPP motion was meritorious as to some of plaintiff's claims.  We accordingly reverse in part the order denying the anti-SLAPP motion and remand for further proceedings.

---

[1] SLAPP is an acronym for strategic lawsuit against public participation.  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).)  All undesignated references are to the Code of Civil Procedure.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Allegations of the Complaint

Gebhardt is a senior detective at the Fremont Police Department (FPD or Department) who alleges he was retaliated against for exposing a Department-wide failure to protect the privacy of detained juveniles on phone calls with counsel. For this, and a couple of unrelated efforts to expose the wrongdoing of superiors, he alleges he was subjected to criminal and administrative investigations and placed on extended periods of administrative leave and modified duty, with all the attendant disruption to his career.

More specifically, the complaint alleges as follows: In August 2020, a City official informed him she was being blackmailed and extorted, and defendant immediately began a criminal investigation. The official told plaintiff she had already spoken about the blackmail with the police chief, Kimberly Petersen, who had advised her to record the blackmail calls. Plaintiff believed this instruction was unlawful and contrary to accepted police practices. He reported what he believed to be violations of the law to Captain Fred Bobbitt, and reported the blackmail and extortion to the Federal Bureau of Investigation.

In March 2021, the Fremont City Manager, Mark Danaj, told plaintiff that Chief Petersen was going to announce her retirement and he planned to replace her with Captain Sean Washington. In discussing the appointment, Danaj acknowledged that Captain Bobbitt, an African-American, had made complaints regarding race-based discrimination and retaliation, but Danaj said he could not be viewed as racist because in elevating Captain Washington he was choosing another African-American as police chief. Plaintiff reported this conversation to his supervisors and said he believed

the City was retaliating against Bobbitt for reporting discrimination based on race. He later provided testimony in Captain Bobbitt's grievance alleging discrimination and retaliation.

The Department had a policy that juvenile suspects in custody should be under constant visual and/or audio supervision (including recording) except when using the bathroom or when a family member, guardian or attorney was visiting. The complaint asserts "there was no exception to FPD's 'record and document' policy for when a juvenile suspect was on a phone call with a family member, guardian, and/or lawyer." On March 3, 2021, a 15-year-old suspect was detained, placed in an interview room, and, consistent with this policy, visually monitored and recorded. Plaintiff called the Public Defender's office to facilitate a legally mandated consultation between the suspect and an attorney. The suspect was recorded during the telephone call with the Public Defender's office.

Plaintiff learned shortly afterward that recording a juvenile suspect speaking on the telephone with an attorney was unlawful and violated attorney-client privilege. Plaintiff alerted his chain of command to the impropriety and thereafter refused to comply with the Department's policy of recording suspects as they were speaking with an attorney. He also spoke with the District Attorney's office and said he would take steps to ensure the Department complied with the law.

FPD Captain Sean Washington sent a Department-wide email ordering officers not to record juveniles while they were speaking with an attorney. The next day, March 6, 2021, Washington informed plaintiff that Chief Petersen had asked the District Attorney's office to investigate plaintiff criminally for his conduct during the March 3, 2021 interview with the juvenile suspect. Plaintiff was placed on administrative leave and instructed

3

not to contact anyone within the Department's command staff other than Captain Washington, and he was ordered not to set foot in the Department or the police campus. Plaintiff alleges the Department's actions were retaliation for his disclosure of its violations of law and for his own refusal to violate the law.

No other officers were investigated or placed on administrative leave for following FPD's procedures regarding monitoring and recording juvenile suspects, including telephone calls with attorneys.

In what plaintiff asserts was further retaliation for his protected activity, the Department allegedly altered a "publicly released officer involved shooting video" to delete comments Chief Petersen had made addressing recent laws requiring juveniles to consult with legal counsel before a custodial interrogation.

Plaintiff was the president of the Fremont Police Association, but in May 2021, he felt he had no option but to step down from that role because he was not allowed to enter the police campus, could not support the association's membership, and did not know when his administrative leave would end. During his leave, he had to inform others, including deputy district attorneys, law enforcement agencies, and outside detectives that he was on administrative leave and could not assist them.

Plaintiff alleged the Department engaged in additional retaliation when FPD Sergeant Michelle Griese in June 2021 sent out an email indicating that a prior FPD in-house report-writing course prohibited recording of juveniles' phone calls with their attorneys. When confronted, however, she admitted that the information was not included in any Department policy or materials and that Chief Petersen had instructed her to include the false information in her email. Nevertheless, in July 2021

4

Captain Washington informed plaintiff that Sergeant Griese would handle his internal affairs investigation.

Plaintiff was notified he could return to work on October 1, 2021, after an administrative leave of 30 weeks, the longest of any officer in FPD history. He was placed on modified duty and restricted from handling many of his normal cases. He could not perform any duties or gain access to information about juveniles without authorization, and he had to inform fellow detectives of those restrictions.

In January 2022, plaintiff learned the District Attorney had cleared him of all criminal allegations regarding the March 3, 2021 telephone call between a juvenile suspect and attorney, and on February 18, 2022, the District Attorney sent Chief Washington a letter to that effect. The same day, Chief Washington told plaintiff he intended to move forward with an administrative investigation of internal policy violations plaintiff might have committed: (1) failing to maintain competency in new laws and current case law; (2) denying an individual's constitutional rights; and (3) failing to work within legally and professionally accepted practices in areas such as interrogation, arrest, or detention. The Department "tolled" the usual one-year time frame for the investigation, the first time in its history it had done so.

In March 2022, plaintiff complained to his supervisor and Department command staff about his modified duty status and the Department's conduct of the investigation. Two days later, he was approved to resume his regular duties. According to plaintiff, his modified duty was the longest in Department history for non-injury related reasons, and no other employees who recorded telephone calls as he had were placed on modified duty.

5

The sergeant who was in charge of the internal affairs investigation submitted findings that plaintiff had not violated any FPD policies, but Chief Washington, in what plaintiff characterizes as further acts of retaliation, first directed the sergeant to redraft the findings multiple times, and then declined to accept in full the recommended exoneration. Instead, he " 'exonerated' Plaintiff" on allegation 1, found allegation 2 " 'not sustained,' " and found allegation 3 " 'sustained.' " Chief Washington acknowledged that the " 'sustained' " finding would be taken into consideration for future promotions, evaluations, and re-examinations for plaintiff's position as a senior detective. Plaintiff pursued an administrative appeal, and the Assistant City Manager upheld Chief Washington's " 'sustained' " finding on allegation 3.

In what plaintiff characterizes as a further act of retaliation, he was chosen to be part of a committee assigned to work on changing the Department's policies for interviewing juveniles.

These events, plaintiff alleged, harmed his professional reputation and professional prospects, as well as his personal health and well-being, and will likely lead to reduction in his income and pension benefits.

Based on these general allegations, plaintiff asserted causes of action for retaliation and failure to take reasonable steps to prevent retaliation in violation of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA) and retaliation in violation of Labor Code section 1102.5.

## II. Anti-SLAPP Motion

The City brought a special motion to strike the complaint pursuant to section 425.16. It asserted that all of plaintiff's claims arose from conduct protected by the anti-SLAPP statute because they were based on

6

communications made to the District Attorney's office asking for an investigation or in connection with the Department's own internal investigation, and on actions taken in connection with those investigations, such as placing plaintiff on administrative leave or modified duty. And, the City argued, plaintiff could not show a probability of prevailing on the merits of any of his claims both because the alleged conduct of Chief Petersen and Chief Washington enjoyed absolute immunity and because the Department took no adverse employment action against plaintiff.

The trial court denied the special motion to strike, finding that the complaint did not arise from activity protected by the anti-SLAPP statute. It found that although the alleged wrongful acts were taken as part of an official proceeding, they were not done " 'in furtherance of the [City's] right of petition or free speech.' " (§ 425.16, subd. (b)(1).) Because the trial court concluded the City had not shown the acts alleged were protected activity, it did not go on to consider whether plaintiff had shown a probability of success on the merits. This timely appeal ensued. (§§ 425.16, subd. (i), 904.1, subd. (a)(13) [order granting or denying special motion to strike is appealable].)

**DISCUSSION**

## I. Legal Framework

Section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Such an act is defined to include written or

7

oral statements or writings (1) "made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," (2) "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," (3) "made in a place open to the public or a public forum in connection with an issue of public interest," as well as (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The court follows a two-step process in considering a special motion to strike. First, it decides whether the defendant has shown that the challenged cause of action arises from protected activity, that is, activity that falls within one of the categories of section 425.16, subdivision (e). If that showing has been made, the court then determines whether the plaintiff has demonstrated a probability of success on the claim. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463.) The court may consider the pleadings as well as supporting and opposing affidavits regarding the facts on which the defendant's liability or defense is based. (§ 425.16, subd. (b)(2).) On appeal, our review is de novo. (*Hecimovich*, at p. 464.)

Our high court has explained that a defendant's burden in the first step is "to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged

8

claim and what actions by the defendant supply those elements and consequently form the basis for liability.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*), citing *Park*, *supra*, 2 Cal.5th at pp. 1060, 1063.) The court then determines whether the defendant has established that "the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in" section 425.16, subdivision (e). (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66 (*Equilon Enterprises*); accord, *Wilson*, at p. 884.) Our high court has emphasized that "the mere fact an action was filed after protected activity took place does not mean it arose from that activity. [Citation.] Rather, ' "the act underlying the plaintiff's cause" or "the act which forms the basis for the plaintiff's cause of action" must *itself* have been an act in furtherance of the right of petition or free speech.' " (*Equilon Enterprises*, at p. 66, quoting *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1002; see *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; see also *Park*, at p. 1064 [noting "distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim"].)

A motion to strike "may be used to attack parts of a count as pleaded," and within a single pleaded "cause of action," "*allegations of protected activity that are asserted as grounds for relief*" may be stricken unless the plaintiff shows a probability of prevailing. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 393, 395 (*Baral*).) That is, where a single cause of action includes both claims supported by allegations of protected activity and claims based on unprotected activity, an anti-SLAPP motion "cannot be defeated by showing a likelihood of success on the claims arising from unprotected activity. (*Id.* at p. 392.) Rather, in such a case, if the moving defendant shows that relief is

9

sought based on allegations arising from protected activity, the burden shifts to the plaintiff to demonstrate that each claim based on protected activity has minimal merit. (*Id*. at p. 396.) If the plaintiff fails to make that showing, "[a]llegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Ibid*.; see *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1011 (*Bonni*) [rule applies even where motion to strike is directed at entire cause of action as pleaded].)

However, "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16 [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral*, *supra*, 1 Cal.5th at p. 394.) But to the extent a plaintiff alleges acts "as a basis for relief and not merely as background, each act or set of acts must be analyzed separately under the usual two-step anti-SLAPP framework. (*Bonni*, *supra*, 11 Cal.5th at p. 1012.)

These general principles have been applied in the context of claims of retaliation in connection with disciplinary proceedings. *Bonni* is particularly pertinent to our inquiry. A physician who had staff privileges at two hospitals faced peer review proceedings after he performed surgeries with the use of a robotic assistant. The surgeries resulted in patient complications, and the physician complained that the robotic assistant did not function properly. (*Bonni*, *supra*, 11 Cal.5th at pp. 1004–1005.) One of the hospitals suspended his staff privileges, and its medical executive committee recommended they be terminated. The hospital was then required to, and did, report the disciplinary action to the Medical Board of California and the National Practitioner Data Bank. (*Id*. at p. 1005.) After a formal hearing, the hospital hearing committee determined the medical executive committee

10

had sustained its burden on only some of the charges and had not shown that either suspension or termination was warranted. The medical executive committee requested an administrative appeal, the parties settled, and the physician agreed to resign and release the hospital from any claims. (*Ibid.*)

A similar process occurred at the other hospital. A peer review recommended that the physician's privileges be suspended, the chief of staff imposed a summary suspension, and the suspension triggered a duty to file reports. (*Bonni, supra*, 11 Cal.5th at p. 1006.) The physician applied for reappointment to his privileges, and the hospital's medical executive committee recommended denial of the application. A hearing took place before the hospital's judicial review committee, which concluded the original suspension was justified but its continuance was no longer warranted. (*Ibid.*) After a further appeal, the hospital's board of trustees denied renewal of the physician's staff privileges. (*Id.* at pp. 1006–1007.)

The physician brought an action against the two hospitals and others involved in the disciplinary process alleging the hospitals retaliated against him for raising patient safety concerns by suspending him, reporting his suspensions to the state medical board, subjecting him to peer review proceedings, defaming him, and terminating his privileges, and that the first hospital retaliated against him by fraudulently inducing him to enter into the settlement agreement and then breaching that agreement. (*Bonni, supra*, 11 Cal.5th at p. 1007.) The hospitals brought an anti-SLAPP motion, and our high court ultimately reviewed the rulings on that motion. (*Id.* at pp. 1007–1008.)

The court explained in *Bonni* that it must differentiate between claims based on protected speech and petitioning in connection with hospital peer review proceedings and the resulting disciplinary actions. (*Bonni, supra*, 11

11

Cal.5th at p. 1014.)  The court concluded that the defamation and character assassination that the plaintiff alleged were "quintessential speech activities" and were protected under the anti-SLAPP statute to the extent the speech was made in connection with peer review.  (*Id.* at p. 1016, citing *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 200.)  Similarly, reporting the physician's summary suspensions to the state medical board and the National Practitioner Data Bank, arguments made before a peer review panel, a recommendation to a hospital board, and subjecting the physician to the peer review process, were protected as statements or writings in connection with an issue being considered in an official proceeding.  (*Bonni*, at p. 1017; see § 425.16, subd. (e)(2).)  If those claims failed the second prong of the anti-SLAPP test—a lack of merit—and were stricken from the pleadings, the physician could no longer seek to impose liability for those acts.  (*Bonni*, at p. 1019.)

Our high court reached a different conclusion as to the disciplinary actions of suspending and terminating the physician's staff privileges.  Those actions, the court concluded, were not protected by the anti-SLAPP statute because the hospitals "ha[d] not drawn any connection between their disciplinary actions and their petitioning or speech abilities."  (*Bonni*, *supra*, 11 Cal.5th at p. 1021.)  That is, "[n]o connection between the Hospitals' choice of which doctor should receive staff privileges and its ability to speak or petition on public issues is apparent."  (*Id.* at p. 1022.)  The court distinguished *Wilson*, which concluded that a news organization's choice of reporters might qualify as conduct in furtherance of the organization's speech on matters of public importance.  (*Ibid.*, fn. 10.)

Applying similar principles, the court in *Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 362, concluded an employer's "act of

12

placing plaintiff on administrative leave, with the intention of terminating her employment, was not an exercise of its petitioning or free speech rights," because the plaintiff's challenge was to the retaliatory employment decision, not the process that led to it.

With this landscape in mind, we next examine plaintiff's claims.

## II.   Claims Relating to Administrative Leave and Modified Duty

To a significant extent, the actions giving rise to the liability plaintiff alleges are his placement on administrative leave and modified duty and barring him from going to the police campus. Those actions, he asserts, injured him economically by forcing him to lose opportunities for overtime pay and noneconomically by causing him to resign as president of the Fremont Police Association, to miss professional events, and to suffer emotional and physical harm from stress and anxiety as well as harm to his reputation. And, he alleges, the harm to his reputation will likely influence his plans for retirement and adversely affect his pension and other benefits in retirement.

These alleged actions are similar on their face to the disciplinary actions of suspending and terminating staff privileges in *Bonni*, which were not protected by the anti-SLAPP statute. (*Bonni*, *supra*, 11 Cal.5th at p. 1021.) As our high court explained, "disciplining a doctor based on the view that the doctor's skills are deficient is not the same thing as making a public statement to that effect. The latter is, or may be, speech on a matter of public concern. The former is not speech at all. [Citation.] Treating disciplinary acts indistinguishably from speech—such that if stating a given viewpoint would warrant constitutional and anti-SLAPP protection as an exercise of free speech rights, the same protection should extend equally to any actions motivated by that viewpoint—assumes, at root, that conduct

13

generally is tantamount to speech." (*Ibid*.) The court rejected this view. (*Id.* at pp. 1021–1022.) It also explained that conduct that is "factually related to actual speech or petitioning"—such as a suspension of staff privileges triggering required reports—is not necessarily protected by section 425.16. (*Id.* at pp. 1022–1023.)

The City seeks to distinguish *Bonni* on the ground that in the present case there is a connection between its actions in placing plaintiff on administrative leave and modified duty and its ability to engage in the protected activity of communicating on matters of public interest. As the court in *Bonni* explained, section 425.16, subdivision (e)(4) covers not only " 'expressive' conduct" but also " 'any other conduct in furtherance of' protected speech and petitioning," and thus may cover conduct that "advances the [defendant's] '*ability* to speak [or petition] on matters of public concern.' " (*Bonni, supra*, 11 Cal.5th at p. 1022.) But, the court explained, the defendants there had not "drawn any connection between their disciplinary actions and their petitioning or speech abilities." (*Id.* at p. 1021.)

A different factual scenario was present in *Wilson*, which examined the anti-SLAPP statute's application to employment discrimination and retaliation claims. The employer was a news organization, CNN, which terminated the employment of the plaintiff, a writer and producer, asserting as its ground that he committed plagiarism. (*Wilson, supra*, 7 Cal.5th at p. 882.) In turn, the plaintiff sued CNN, alleging he was denied promotions, given unfavorable assignments, and fired because of his race and other protected characteristics and in retaliation for making complaints about discrimination and taking parental leave. (*Ibid*.)

On review, our high court considered whether the trial court properly granted CNN's anti-SLAPP motion. The court defined the question before it

14

as "whether, and when, a news organization's selection of its employees bears a sufficiently substantial relationship to the organization's ability to speak on matters of public concern to qualify as conduct in furtherance of constitutional speech rights." (*Wilson*, *supra*, 7 Cal.5th at p. 894.) It concluded that CNN had not shown that its decisions regarding which assignments to give the employee, a field producer who did not exercise authority to determine CNN's message, had a substantial relationship to its ability to speak on matters of public concern. (*Id*. at pp. 896–897.) However, to the extent the plaintiff's claims rested on CNN having decided to terminate him for plagiarism, that was "conduct 'in furtherance of' the organization's free speech rights" for purposes of the anti-SLAPP statute. (*Id*. at p. 898, citing § 425.16, subd. (e)(4).) That was because CNN had presented evidence that its ability to participate meaningfully in public discourse depended on its integrity and credibility, and disciplining an employee for violating journalistic ethical standards "furthers a news organization's exercise of editorial control to ensure the organization's reputation, and the credibility of what it chooses to publish or broadcast, is preserved," objectives that lay " 'at the core' " or CNN's function. (*Ibid*.) But other acts of alleged discrimination and retaliation that took place before CNN was aware of any potential plagiarism did not fall within the ambit of section 425.16. (*Wilson*, at p. 898.)

The City argues that its actions in placing plaintiff on administrative leave and modified duty are protected by section 425.16 under the reasoning of *Wilson*. According to the City, if it had failed to investigate plaintiff's misconduct fully, it would have suffered serious damage to its credibility. For this, it relies on evidence that plaintiff trained other police officers on various topics, including interviewing juvenile suspects; that Chief Petersen believed

15

she had a duty to inform the district attorney about plaintiff's actions in recording a juvenile suspect's consultation with an attorney because of the similarities between those actions and another publicized case in which a sergeant in the Sheriff's office had been prosecuted; and that she was concerned that allowing plaintiff to continue working in his current capacity could lead to adverse consequences for the Department and the City if he were later criminally charged. According to the City, it participates in public discourse in its role as a governing body, and the police department's credibility is vital to that participation, thus satisfying the requirements of *Wilson*.[2]

The City reads too much into *Wilson*. As our high court explained in *Bonni*, *Wilson* showed that a news organization's firing of a journalist who engaged in plagiarism may qualify as conduct in furtherance of speech on public matters because the organization's ability to broadcast and participate in public discourse depended on its credibility. (*Bonni*, *supra*, 11 Cal.5th at p. 1020, fn. 9.) But that does not mean that any action that might affect an organization's credibility is protected by the anti-SLAPP statute. Rather, there must be a showing of a " 'substantial relationship' " between the defendant's actions and its ability to *speak or petition* on matters of public concern. (*Id*. at p. 1020.) The defendant in *Wilson* was a news organization, one whose mission was to speak on matters of public concern, and the Court recognized the organization's ability to discipline an employee for violating

---

[2] Although the City did not raise this precise argument below and did not expressly rely on subdivision (e)(4) of section 425.16, it did rely upon Chief Petersen's knowledge of the case involving the Sheriff's office and her concern that the City could be exposed to adverse consequences if plaintiff continued to work in his regular capacity. Rather than treating this argument as forfeited, we will address it on the merits.

16

journalistic standards was necessary "to ensure the organization's reputation, and the credibility of what it chooses to publish or broadcast," objectives that "lie 'at the core' of the press function." (*Wilson*, *supra*, 7 Cal.5th at p. 898.) Here, despite the City's conclusory assertions in its briefs on appeal, it made no factual showing that its ability to speak on matters of public concern would have been harmed had it not placed plaintiff on administrative or modified duty and limited his access to the Department's offices. We thus conclude the City has not met its first-prong burden to show these actions are protected by section 425.16.

## III.   Other Claims

That is not the end of our inquiry. The complaint also includes allegations of other communications and acts that plaintiff asserts were unlawful retaliation for his whistle-blowing conduct. In particular, the complaint alleges that Chief Petersen acted in retaliation when she asked the district attorney's office to investigate plaintiff criminally, and that Chief Washington acted in retaliation when he informed plaintiff he would move forward with an administrative investigation, instructed an internal affairs sergeant to redraft findings in the administrative review, and then overrode those findings and sustained the allegation that plaintiff failed to work within legally and professionally accepted practices.[3]

---

[3] In its opening brief, the City also argues that plaintiff's allegation that the Department retaliated against him by editing a publicly available video is protected by section 425.16. But, as plaintiff points out, in its moving papers below the City did not identify the video as a basis for its anti-SLAPP motion. The City bore the burden to identify all allegations of protected activity (*Baral*, *supra*, 1 Cal.5th at p. 396), and at least as to this allegation the City did not meet its burden under the first prong. We will therefore not consider the alleged edits to the video.

17

In our view, these alleged actions fall within the meaning of "any written or oral statement or writing made in connection with an . . . official proceeding authorized by law." (§ 425.16, subd. (e)(2); see *Bonni, supra*, 11 Cal.5th at p. 1017; see also *Santa Clara Waste Water Co. v. County of Ventura Environmental Health Division* (2017) 17 Cal.App.5th 1082, 1090 [first anti-SLAPP prong met where action "directly aimed at [defendant's] right, if not obligation, to inform parties" that it found a chemical to be a hazardous waste]; *Imig v. Ferrar* (1977) 70 Cal.App.3d 48, 54–57 [treating police department's investigation of officer misconduct as official proceeding].)[4]

Plaintiff contends these allegations are not subject to being stricken because they are not the basis of the relief he seeks, but rather are used as incidental background or evidence of retaliatory intent or pretext, matters that are not subject to an anti-SLAPP motion. (See *Park, supra*, 2 Cal.5th at p. 1060.) It is true that much of the harm plaintiff alleges he suffered, in the form of lost income and reputational harm, was caused not by Chief Petersen reporting his conduct or by the criminal or internal investigations themselves, but by his placement on administrative leave and modified duty and his exclusion from FPD facilities. (See *Equilon Enterprises, supra*, 29 Cal.4th at p. 66 [conduct by which plaintiff claims to be injured must fall within one of categories described in § 425.16, sub. (e)].) But it is also true that plaintiff alleges repeatedly and specifically that these other acts themselves were taken in retaliation for his engaging in protected activity.

_____

[4] Plaintiff also alleges the Department retaliated against him by appointing him to a policy committee. Whatever the merits of this claim, the City has not established that this appointment falls within the scope of section 425.16, subdivision (e).

18

And plaintiff alleges that one of the adverse employment actions inflicted on him was "being denied a work environment free of retaliation."

In effect, plaintiff asks us to ignore these allegations for purposes of the anti-SLAPP motion. In *Bonni*, our high court faced a similar argument, with a plaintiff who argued that alleged defamation and character assassination were not material to his retaliation claims. The court rejected this effort, explaining, "[I]f Bonni truly meant only to raise these claims as window dressing, there would be no reason to strike them. [Citation.] But the complaint makes clear that Bonni intended them to have operative effect: The complaint in no uncertain terms lists the alleged defamation and character assassination as conduct taken in retaliation for his expression of patient care concerns, thus satisfying essential elements of his retaliation claims. If Bonni wishes to abandon the retaliation claims based on defamation and character assassination, he may seek to do so in an appropriate forum. But for present purposes, we will assume his complaint means what it says." (*Bonni*, *supra*, 11 Cal.5th at p. 1017.) The same is true here. We take the complaint at its word that Gebhart's claims are based at least in part on these alleged retaliatory acts. As to these allegations, then, we must proceed to the second step and determine whether plaintiff has met his burden to show the requisite minimal merit.

Government Code section 12940 makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [FEHA]." (Gov. Code, § 12940, subd. (h); see Lab. Code, § 1102.5, subd. (b).) To establish a claim for retaliation, "the plaintiff must show he or she engaged in [an activity protected by FEHA], the employer subjected the employee to an adverse employment action, and a causal link existed between the protected activity

19

and the employer's action." (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386.)

Our high court has explained that an adverse employment action for purposes of a retaliation claim need not be an "ultimate employment action[] such as termination or demotion," but may also encompass "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1053–1054.) Under this rule, "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [Government Code section 12940, subdivisions (a) and (h)]." (*Yanowitz*, at pp. 1054–1055; see *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1387, disapproved on another ground in *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718, fn. 2.) But "mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under FEHA," absent a showing that "the employer wrongfully uses the negative evaluation to substantially and materially change the terms and conditions of employment." (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1457 (*Akers*).)

The City argues plaintiff has not shown a likelihood of success on the merits because there is no evidence it took an adverse employment action.

20

We agree that plaintiff has not met this burden. We have carefully reviewed the evidence plaintiff submitted in opposition to the anti-SLAPP motion, which is limited to his own declaration, and we have also reviewed the evidence submitted by the City. This record shows that no formal discipline was imposed as a result of either the criminal or the internal investigation and that the Assistant City Manager's order sustaining Chief Washington's findings emphasized that plaintiff remains a valuable long-term member of the Department. There is no evidence that he was demoted or that his compensation or other conditions in employment changed at all, let alone materially. (See *Pinero v. Specialty Restaurants Corp.* (2005) 130 Cal.App.4th 635, 646.) Although the complaint alleged that Chief Washington acknowledged that a sustained finding would be taken into account for future promotion and evaluations, Plaintiff provided no evidence, through declaration or anything else, that the finding has rendered him unpromotable or otherwise dimmed his future prospects. (Compare *Akers*, *supra,* 95 Cal.App.4th at p. 1457 [management had demonstrated willingness to use negative information against plaintiff in significant employment decisions].) And notably, in his brief on appeal plaintiff disavows any suggestion that the harm he alleges stemmed either from statements Chief Petersen made to the District Attorney or from "writings and verbal statements in connection with the IA investigation." As a result, to the extent the complaint seeks to claim that plaintiff has suffered or will suffer harm from those of the City's actions that fall within the ambit of the anti-SLAPP statute, he has not met his burden to show a probability of success on the merits.

Nevertheless, we conclude these allegations need not be stricken entirely from the complaint. That is because the alleged acts—treating

21

plaintiff differently from others who engaged in the same conduct and trying to cover up the City's knowledge of an unlawful policy—may also provide evidentiary support for plaintiff's remaining claims that the City retaliated against him for engaging in FEHA-protected activity. (See *Baral*, *supra*, 1 Cal.5th at p. 396 [allegations of protected activity supporting stricken claim not eliminated from complaint if they support claim not subject to anti-SLAPP motion].)  To the extent plaintiff alleges these actions themselves constituted actionable retaliation, however, those allegations must be stricken from the complaint.[5]  We will direct the trial court to do so on remand.

## IV.    Attorney Fees

The City contends it is entitled to the attorney fees and costs it expended in bring the anti-SLAPP motion.  With exceptions not pertinent here, the prevailing defendant on a special motion to strike is entitled to attorney fees and costs.  (§ 425.16, subd. (c)(1).)  This rule applies even if the defendant is only partially successful on the motion, "unless the results of the motion were so insignificant that the party did not achieve any practical benefit from bringing the motion." (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 340 (*Mann*); accord, *Lin v. City of Pleasanton* (2009) 176 Cal.App.4th 408, 425–426 (*Lin*); *Moran v. Endres* (2006) 135

---

[5] As one example, the trial court might strike italicized clause from the following sentence in paragraph 34 of the complaint:  "That same day, *in further retaliation for engaging in* [*FEHA-*]*protected activity as outlined herein*, Plaintiff received a call from Chief Washington who stated that although Plaintiff was criminally cleared, Chief Washington intended to move forward with an administrative investigation against plaintiff into potential internal policy violations Plaintiff may have committed."  (Italics added.)

Cal.App.4th 952, 956.) As the court in *Mann* explained, the fees awarded "should be commensurate with the extent to which the motion changed the nature and character of the lawsuit in a practical way." (*Mann*, at p. 345.)[6]

The determination of whether a party achieved enough benefit to be a prevailing party is within the trial court's discretion (*Ross v. Seyfarth Shaw LLP* (2023) 96 Cal.App.5th 722, 732, *Mann, supra,* 139 Cal.App.4th at p. 340; *Lin, supra,* 176 Cal.App.4th at p. 426), and the trial court had no occasion to exercise its discretion on this issue. Nor have the parties briefed the practical effect of the partial reversal that we today order. In the circumstances, we shall direct the trial court, on remand, to determine whether the City is entitled to attorney fees and costs as the prevailing party on the motion to strike and, if so, the amount of those fees.

## DISPOSITION

The order denying the anti-SLAPP motion is reversed in part and the matter is remanded for further proceedings consistent with this opinion. On remand, the trial court shall strike from the complaint any allegations that the City retaliated against plaintiff through the activity we have concluded was protected by section 425.16. It shall also determine whether the City is entitled to attorney fees and costs as the prevailing party and, if so, the amount of those fees. In all other respects, the order is affirmed. The parties shall bear their own costs on appeal.

---

[6] *Mann* also explains that "[a] 'prevailing party' with respect to an appellate cost award is not necessarily the same as a 'prevailing party' under the anti-SLAPP statute," and appellate courts have discretion to make any appropriate award of costs on appeal. (*Mann, supra,* 139 Cal.App.4th at p. 341.)

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Gebhardt v. City of Fremont* (A167835)